372 So.2d 745 (1979)
Charles E. McCREARY
v.
COMMERCIAL UNION INSURANCE COMPANY et al.
No. 10170.
Court of Appeal of Louisiana, Fourth Circuit.
June 5, 1979.
*746 Craig R. Nelson, Hammett, Leake, Hammett, Hulse & Nelson, New Orleans, for defendants-appellants.
Robert L. Manard, III, Manard, Schoenberger & Ryan, New Orleans, for plaintiff-appellee.
Before LEMMON, SCHOTT and GARRISON, JJ.
SCHOTT, Judge.
In his original petition plaintiff brought suit against Commercial Union Assurance Company, Woodward Wight & Company, Ltd., and T. H. Hughes, Jr. (sometimes collectively referred to as appellants), seeking damages for injuries he allegedly sustained when his automobile was struck by Hughes' automobile on November 11, 1975. He subsequently filed a supplemental and amending petition alleging that he was injured on February 16, 1976, when his automobile was struck by an automobile operated by one Edgar M. Lewis. Alleging that Lewis was uninsured, he made his own uninsured motorist's insurer, Hartford Accident & Indemnity Company (Hartford) a defendant along with Lewis.
The original and the supplemental petitions contained identical allegations that plaintiff "suffered severe and disabling personal injuries to his mind and body which required surgery and resultant permanent disability."
Before this case went to trial plaintiff settled his claim against Hartford for the injuries he sustained in the second accident for $20,000, and he dismissed his suit against Hartford. In the meantime, Hartford filed a third party demand against Lewis for whatever amount it might be cast in plaintiff's favor. Appellant Hughes filed a third-party demand against Lewis and Hartford, seeking indemnity or contribution against them for whatever damages he might be cast unto plaintiff, and Hartford responded with various exceptions.
Following these events a number of procedural developments took place. Appellants filed a rule against plaintiff to set aside his settlement with Hartford or, alternatively, for an order authorizing full disclosure to the jury of the terms and conditions of the settlement. Hartford filed a motion to sever the third party demand it had filed against Lewis from the main demand which was scheduled for trial before a jury. On November 22, 1977, the court ordered:
"That the rule to set aside the settlement between plaintiff and Hartford Accident & Indemnity Co., filed by Commercial Union, et als and the rule to advise the jury of the settlement also filed by Commercial Union, et als, be and the same are both denied, and defendant and its Counsel and witnesses are instructed by the Court not to use any testimony, remarks, questions, or arguments which might inform the jury of such information."
He also ordered that the trial of Hartford's third party demand against Lewis be severed from the trial of the main demand.
Appellants then applied for writs to this court, whereupon we vacated the ruling of the trial court with respect to the admissibility of the fact of the settlement. The following was our rationale for this action:
"The fact of a second accident (possibly causing damages similar to those complained of in a first accident) and any medical evidence relating thereto is admissible because relative to quantum of damages caused by the first. That a claim arising out of the second accident has been settled is also admissible for the purpose of showing that there is no longer a pending claim against the second tortfeasor (or, as here, a solvent uninsured motorist insurer answerable for him).

*747 Existence of two claims against solvent defendants tend to keep the claimant unbiased in his testimony of complaints relative to either accident. Settlement of one claim so as to exclude one of the solvent defendants might tend to make the claimant, even subconsciously, shade his testimony to attribute complaints to the accident in which the claim is still pending. The fact of the settlement therefore bears on credibility and is admissible.
Unless the remaining solvent defendant is liable to the other for, or is entitled to credit for, some portion of the settlement, the amount of the settlement is irrelevant. The amount represents the judgment of persons who are not the triers of fact in the case being tried."
On January 6, 1978, the third party demand of Hughes against Hartford was dismissed and from this judgment no appeal was taken. The case proceeded to trial on the main demand before a jury and plaintiff was awarded a verdict in the amount of $75,000, whereupon appellants have taken this appeal. Appellants have specified the following errors for our consideration: (1) the amount of the award was excessive, (2) the amount of the award should be reduced either to zero or to 50% as a result of the settlement plaintiff made with Hartford, (3) the finding that Hughes was guilty of negligence which was the sole and proximate cause of the accident was manifestly erroneous, and (4) plaintiff's injuries were not caused exclusively by the November, 1975, accident. For a preliminary understanding of these specifications it behooves us to review the uncontro verted facts brought out at the trial.
On the date of the accident in November, 1975, plaintiff was in the process of leaving the parking lot adjacent to the building where he resided when his automobile was struck by Hughes' automobile. Hughes was backing out of his parking spot in the lot prior to colliding with plaintiff. Immediately after the collision while plaintiff was getting out of his car he struck his head above the door. Two days later plaintiff sought medical attention from Dr. Arthur J. Axelrod to whom he was referred by Commercial Union's claims adjuster. He was complaining of pain in his neck. On February 16, 1976, plaintiff's automobile was struck by an automobile operated by Lewis and three days later plaintiff sought medical attention from Dr. Claude Craighead. He was complaining primarily about pain in his neck. Except for the one visit to Dr. Axelrod on November 13, 1975, plaintiff had sought no other medical treatment until this visit to Dr. Craighead, and between February 19 and March 26 Dr. Craighead continued to treat plaintiff for his neck complaints when he referred plaintiff to Dr. Kenneth Vogel, a neurosurgeon. Dr. Vogel had a myelogram and a discogram run on plaintiff which confirmed the disc, and he then performed an anterior cervical fusion at this site.
From this summary it becomes clear that the most serious issue presented in the case is the question of causation by the first accident for the extensive medical problems which plaintiff eventually encountered. The jury undoubtedly concluded that the ruptured disc was caused by this accident or they would have returned a verdict for considerably less. From our review of the record we have concluded that this ultimate determination of causation was within the fact finding province of the jury and the instructions given to the jury were such that the issue was properly presented to the jury for its determination. A summary of the testimony is now presented to support this conclusion.
The testimony of plaintiff: When his car was struck by Hughes he was thrown forward and struck his head on the sun visor. He opened the door to get out and "whacked" his head again. When his automobile approached the Hughes car he saw no indication that it was about to move and when it began to back out there was nothing he could do to avoid being struck. He did slam on his brakes, which caused him to flip forward. The left rear corner of Hughes' car struck his car on the right side just about at the center post. On the following *748 morning he felt pain in his neck which he described "just like a knife turning around in my neck." He also had headaches. His description of the examination made of him by Dr. Axelrod was quite different than the doctor's description. He described a superficial examination while the doctor described a meticulous neurological examination on plaintiff. Dr. Axelrod prescribed medication, hot showers and compresses for his neck, which he took and which provided him with temporary relief. His pain became progressively worse with the passage of time, and he started feeling pain running down to his elbow with numbness developing in his fingers two or three weeks after the accident. He did not go back to Dr. Axelrod because he had no confidence in him, but before the February accident the pain had increased to the point where he had to see another doctor. Nevertheless, he simply continued to treat himself at home until he saw Dr. Craighead on February 19. The second accident on February 16 occurred while he was stopped in traffic and the other automobile backed into his automobile. He saw the accident coming and was able to brace himself in contrast to the previous accident where he was caught by surprise, and when the police investigated the accident he reported that he was not hurt. On cross examination, plaintiff testified that he filed the suit against Hartford based on the second accident, claiming $300,000 for severe and disabling personal injuries on the advice of his attorney because of possible aggravation of the injuries he sustained in the November accident. He admitted that the suit against Hartford was settled out of court and that he received some compensation, but he insisted that he did not feel that he was hurt in that February accident and he suffered no increase in his existing pain and discomfort. He admitted that following the first accident he had worked through November, December and January, not missing an entire day but only parts of days when he went home to take heat treatments.
Testimony of Dr. Claude Craighead: When he examined plaintiff on February 19, 1976, he took a history from plaintiff in which plaintiff told him that he had begun to experience pain in his neck on the day after the November accident and he had been treating himself for his pain over the course of the previous two or three months. There was a radiation of his neck pain into the skull and in both shoulders. Given a hypothetical that plaintiff's suffering increased, he missed work periodically and he took medication and self administered heat treatments between the first and second accidents but that there was no increase in pain after the February accident, the doctor admitted that he could not categorically say that the November accident was the cause but stated that "there is a lot of evidence to support the November accident."
Testimony of Dr. Kenneth Vogel: He described an extended course of conservative treatment he rendered to plaintiff from May until September, 1976, when he admitted plaintiff to the hospital. He expressed the opinion that the first accident of November, 1975, precipitated plaintiff's problem on the assumption that plaintiff had no increase in pain after the second accident.
Testimony of Dr. Arthur J. Axelrod: He found no neurological deficit in plaintiff on examining him on November 13, no spasm and no indication of a disc injury. His impression was that plaintiff had a strain to the neck muscles and he advised plaintiff to return if he had any further problems, but he never saw plaintiff again. He testified quite categorically that plaintiff did not have any disc problem when he saw him in November and that the cause had to be the second accident.
Ultimately the jury's decision was based on their belief of plaintiff's testimony. They accepted his statement that he had been suffering with his neck prior to the second accident and that he felt no increase in pain after the second accident. Since Drs. Craighead and Vogel based their opinion on the statements made to them by plaintiff that he suffered no increase in pain as a result of the second accident, their ultimate opinion also rested on the degree of credibility to be assigned to plaintiff.
*749 We are unable to substitute our judgment for the jury's in this credibility determination and accept their finding that plaintiff's ultimate surgery and disability were substantially the result of the first accident.
We emphasize that this case was tried under circumstances where appellants were given every opportunity to develop the second accident as the cause of plaintiff's injury. In compliance with the mandamus of this court the jury was given the benefit of all of the facts about the second accident as well as the settlement of plaintiff's claim against Hartford, except for the amount of the settlement. When plaintiff was cross examined by appellant's attorney, he admitted that he had filed the second suit against Hartford claiming $300,000 for his injuries, that his claim was settled out of court and that he received compensation. In the presence of the jury he identified the release and settlement of his claim against Hartford and identified his signature on that release. When it was offered in evidence the trial court stated to the jury:
"The Court will admit the document D-4 into evidence, but it will not go to the jury. The jury is by the Court now instructed that there was executed a valid settlement in compromise of that second lawsuit. Beyond that you need know nothing further. This will be kept separate from the rest of your exhibits, so that if the jury takes with them any exhibits to deliberate, this will be excluded from those taken with them."
Similar treatment was given to plaintiff's uninsured motorist policy when plaintiff admitted that he did have that insurance to cover his claim against Lewis. The policy was received in evidence by the court, although it was withheld from the jury's examination.
In his instructions to the jury at the conclusion of the trial, the court stated:
".... [Plaintiff] has the burden of proving to you that the defendant was negligent, and he has the burden of proving to you that whatever injuries he sustained was the proximate result of this particular accident of November 11, 1975."
Later in those instructions when explaining to the jury a stipulation made between counsel that the special medical expenses amounted to $4,708, the trial judge stated:
"... That has been stipulated, but what has not been stipulated is, and what the defense will not stipulate is that all of these expenses necessarily resulted from the one accident which you must concern yourself in this case, and that's the accident of November 11, 1975. You have to determine from the evidence in the case how much of this $4,708 stipulated to is associated with, arose out of as a necessary consequence, the accident of November 11, 1975."
Appellants' concern is that the jury's ignorance over the amount of the settlement with Hartford made them believe that plaintiff was given little compensation for the second accident and was therefore entitled to a substantial amount for the first. But it is just as reasonable to speculate that the jury felt that Hartford owed plaintiff nothing and made a bad settlement no matter what it paid since that second accident caused no aggravation of plaintiff's injuries whatsoever.
We must conclude that the jury applied the court's instructions to the facts and concluded that plaintiff was entitled to compensation for all of his injuries as a result of the first accident. Under these circumstances we fail to see how appellants were prejudiced because the jury did not know the amount plaintiff received in settlement from Hartford. It was sufficient for the jury to know that the second accident occurred and plaintiff settled his case arising therefrom. Appellants had wide latitude to show that it was the second accident which caused plaintiff's injuries and the jury was completely instructed on the point that they were to award compensation to plaintiff for injuries sustained in the first accident only.
In concluding that appellants were not entitled to disclose the amount of Hartford's settlement to the jury, we have considered *750 Dupree v. Pechinay, 369 So.2d 1075 (La.App. 1st Cir. 1979), on which appellants rely. But that case is not authority for appellants' position. Only the footnote on the last page of the opinion states that the jury was aware that plaintiff had received $100,000 in settlement with other defendants, but it neither presents the problem as an issue or hints that there was any objection to the information going to the jury in the first instance.
Turning to appellants' other specifications of error, the foregoing summary of the evidence sufficiently supports the jury's conclusion that the negligence of Hughes was the cause of the accident and that plaintiff was not contributorily negligent. In addition to the testimony of plaintiff to the effect that nothing indicated the presence of Hughes in the car before he was right behind him, Hughes admitted that he never saw plaintiff's automobile at any time prior to the impact. He stated that he looked in his mirror but when he was backing out he looked neither right nor left.
Next, we consider appellants' contention that they are entitled to a reversal or at least a reduction of the amount of the award by 50% on the theory that they were solidarily liable to plaintiff along with Hartford. In support of this theory they rely on C.C.Art. 2103 and Harvey v. Travelers Insurance Company, 163 So.2d 915 (La. App. 3rd Cir. 1964). In disposing of this argument we pretermit the point that plaintiff's claim against Hartford was based on an insurance policy so that there is a question as to how Hartford could be solidarily liable to plaintiff with appellants. In any event, even if Hartford's liability were legally the same as Lewis', there is still no basis for considering appellants liable in solido with Hartford.
In order for solidary liability to exist Lewis and Hughes would have to be considered joint tort feasors under C.C.Art. 2324, which provides as follows:
"He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act."
Obviously, this has no application to the case. These were independent automobile accidents occurring three months apart. Furthermore, any damages caused by the second accident were not the natural and foreseeable consequence of the first, but rather were the result of an unrelated intervening occurrence. See the discussion in Berger v. Fireman's Fund Insurance Company, 305 So.2d 724 (La.App. 4th Cir. 1974) with respect to the nature of the liability of an original tort feasor and allegedly negligent treating physician to the plaintiff.
Finally, we come to the question of the amount of the award and appellants' argument that it was excessive. We have already outlined in general the course of treatment to which plaintiff was subjected from the time of his accident in November, 1975, until he was admitted to the hospital in September, 1976. At the risk of unduly lengthening this opinion, we note that plaintiff's problems increased gradually over a long period of time and was subjected to and cooperated with an extended course of conservative treatment consisting of medication, physiotherapy and heat treatments under the care of Drs. Craighead and Vogel before he was finally hospitalized. Dr. Vogel expressed the opinion that he would have relief of approximately 80 to 90% of his discomfort as a result of the surgery but he would always have some pain and discomfort. Furthermore, he assigned a 15% permanent anatomical disability and felt that plaintiff should avoid lifting, pushing or pulling weights in excess of 50 pounds and hyperextending or flexing his neck. Plaintiff testified that his activities had been curtailed considerably, having to forego golf and bowling. At trial he testified that he still had a nagging ache in his neck and this interfered with his ability to concentrate and therefore to perform his work properly.
Plaintiff had been a comptroller for his company and had been earning $24,000 per year prior to the accident. He was out for six months as a result of his injuries and *751 had a direct loss of wages in the amount of $12,000. Upon his return, his position as comptroller had been taken by someone else and he was relegated to the position of a consultant at a salary of $300 per month less than he was earning before the accident. As always, it is difficult for us to dissect the verdict of the jury in order to learn what amount they assigned for what portion of plaintiff's claim, but it seems clear that included in the $75,000 are the special medical expenses of $4,700, as well as the clear loss of $12,000 for the six months plaintiff was off. Plaintiff testified that he kept his job as a consultant from January until August, 1977, and his services were then terminated because the job was finished. He stated that he had worked with this company from March, 1969, to April of 1971, when he resigned to go back to Colorado because his wife was stricken with cancer, and after his wife died the company's president asked him to come back to work for them. Three weeks after his return to the company in 1975 he was asked to assume the position of comptroller. It seems to be a fair inference from this testimony that had it not been for plaintiff's accident he would have stayed on with his company for several years, especially considering that he was only 55 years of age at the time of the accident. Consequently, the jury was justified in including some additional amount to compensate plaintiff for lost wages and loss of earning capacity beyond the $12,000 which was clearly established.
In Folse v. Fakouri, 371 So.2d 1120 (La. 1979, decided on May 21, 1979, docket No. 63232) the court held that a wide range of discretion is available to the trier of fact in making an award for loss of wages and earning capacity. Since the jury was instructed that plaintiff was entitled to such damages we must assume that a figure of considerably less than $50,000 was awarded for plaintiff's pain and suffering. Considering Coco v. Winston Industries, 341 So.2d 332 (La.1978) we are not persuaded to reduce the award.
After this case was submitted appellants filed a motion to remand this case to the trial court on the basis of affidavits taken from a member of the jury on May 11, 1979, which indicate that the jurors agreed to propose amounts, add them up and divide by twelve, and be bound by the average figure which resulted in the $75,000 verdict awarded. In the motion appellants rely on DeBose v. Trapani, 295 So.2d 72 (La.App. 4th Cir. 1974) writs refused, 299 So.2d 359 (La.App.), in which we considered the validity of a quotient verdict and concluded that the quotient verdict in itself was not necessarily stricken with nullity but the vice is in the prior agreement by the jurors to be bound by the result of the addition and division. In brief appellant's counsel states that he has now contacted other jurors whose version of their behavior is different. Clearly, the question would have to be resolved on a trial wherein both parties would have the opportunity to offer evidence and cross examine adverse juror-witnesses.
However, we have resolved to deny this motion because of the procedural posture of this case. In the motion appellants move to take testimony in order to determine whether or not a new trial should be granted due to jury misconduct. This case is beyond the authority of the trial court to grant a new trial. Once the procedural steps authorized by C.C.P.Arts. 1971 et seq. have been exhausted and appeal is taken the trial court no longer has jurisdiction to take any action with respect to that judgment except to entertain an action of nullity pursuant to C.C.P.Arts. 2001 et seq. The juror's affidavits may provide appellants with a cause of action to annul the judgment because of ill practice under Art. 2004 but they are not entitled to have the present case remanded for further testimony.
Accordingly, the judgment appealed from is affirmed and the motion to remand is denied.
AFFIRMED, MOTION DENIED.