**John Hubert BRAUD**

v.

**Charles PAINTER, et al.**

Civ. A. No. 86–590–A.

United States District Court,
M.D. Louisiana.

Feb. 1, 1990.

2

Keith B. Nordyke, Nordyke & Denlinger, Baton Rouge, La., for plaintiff.

Bradley C. Myers and Pamela Crawford Keller, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, La., for Charles A. Painter, Sam Pasqua, Barney Arceneaux and The City of Gonzales.

Arthur R. Cooper, Bell, Faller, West & Cooper, Baton Rouge, La., for Commercial

**4**

Union Ins. Co., Glen Paul Gonzales, Bill Wade and Glynn Paul LeBlanc.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN V. PARKER, Chief Judge.

Plaintiff, John Hubert Braud, brought this action pursuant to 42 U.S.C. § 1983, alleging deprivation of constitutionally protected rights by officials acting under color of state law. Pendent state law claims are also alleged. Named as defendants are the City of Gonzales, Police Chief Barney Arceneaux, and Officers Charles Painter, Sam Pasqua, Bill Wade, Glen Gonzales and Glynn LeBlanc of the Gonzales Police Department.

Like many south Louisiana towns and cities, the City of Gonzales, population 7500, annually stages an event [1], the Jambalaya Festival, where the town is billed as the Jambalaya Capital of the World.[2] While the Jambalaya Festival does not rival the New Orleans Mardi Gras in size or scope, the three day affair annually attracts thousands of visitors. Food and drink are sold and consumed, there is dancing in the streets and the World's Champion Jambalaya Cook is crowned.

This action involves the tragic aftermath of the 1986 festival.

Upon the conclusion of the trial, certain preliminary oral findings were stated by the court. Some of the findings made at that time are modified by these findings and all of the original oral findings are subordinate to these findings and conclusions, which are intended to be conclusive of all issues.

### FINDINGS OF FACT

#### A. GENERAL

(1) On Sunday, June 15, 1986, John Hubert Braud, a lifelong resident, who has owned and operated a local grocery store for many years, was attending the Jambalaya Festival in Gonzales, Louisiana, in the company of friends and family.

(2) In order to accommodate the crowd, Burnside Street is blocked off, and booths are constructed in the area on both sides of the street.

(3) Although it is not clear who rented and drove it, Mr. Braud, his family and several other families used as their base of operations a motor home which was parked in a parking lot near Burnside Street.

(4) Chairs were set up along the street and people came and went during the three day celebration.

(5) Alcoholic beverages were consumed by most of the Braud party throughout the course of the day.

(6) The Braud party included Mr. Braud, his fiancee', Lenai Travis, his daughter, Rhonda Veazey, and others.

(7) The Festival officially ends at 10:00 p.m. on Sunday, the third day. At approximately 10:15 p.m. on June 15, 1986, Ascension Parish Sheriff's deputies on horseback, and Gonzales city police officers on foot, proceeded down Burnside Street to let the crowd know that the Festival was over, and that it was time to clear the street.

#### B. AS TO THE DEFENDANT PASQUA

(8) There were still many people in the area. As the officers approached the area where the Braud party was located, Sergeant Sam Pasqua of the Gonzales Police Department approached Rhonda Veazey, tapped her on the shoulder and told her that it was time to go home.

(9) Pasqua claims that Veazey was making obscene gestures and yelling at the mounted deputies. She denies any such gesture but admits that she yelled that the horses were too close to the children. The court accepts her testimony.

---

1. Technically the event is not put on by the city fathers—a committee of citizens plans and stages the affair—but the city cooperates fully.

2. In turn, Pontchatoula is billed as the Strawberry Capital of the World, and Breaux Bridge as the Crawfish Capital of the World; Lafitte stages World's Champion Pirogue Races and so on across the state with world championship festival after festival.

(10) As Sergeant Pasqua attempted to prod Ms. Veazey to leave the area by tapping her on the shoulder, Ms. Veazey responded by tapping Pasqua on the shoulder and saying, "I'm going, I'm going." At that time, Sergeant Pasqua seized Veazey by the arm and informed her that she was under arrest. Sergeant Pasqua then began dragging Veazey across the street, in the direction of a police vehicle.

(11) As the two began to cross the street, the plaintiff, Mr. Braud, who was nearby, seized Ms. Veazey's other arm, asking, "What are you doing with my daughter?" or words to that effect. Apparently, some words were exchanged between the two men, and a small tug of war ensued.

## C. AS TO THE DEFENDANT PAINT-ER

(12) In the course of the tug of war over Ms. Veazey, Officer Charles Painter noticed the fracas, approached the area and seized Mr. Braud's free arm with both hands. Painter had known the plaintiff for many years and knew that he was the proprietor of a local grocery store.

(13) Officer Painter yelled, "Mr. Hubert, you're under arrest," and the two men exchanged words. Braud was unarmed and Painter was aware of that. The evidence concerning what took place next is conflicting, but it is clear that the plaintiff attempted to pull away from Painter's grasp and in the course of that struggle, Painter was struck in the face. The blow was not hard and caused only a slight cut for which no medical treatment was required. Painter retaliated by hitting Mr. Braud in the face with his right fist. Braud fell straight back from the impact of the blow, was immediately rendered unconscious and made no attempt to break his fall. Plaintiff's head struck the pavement.

(14) Painter was much younger and much larger and stronger than Mr. Braud. Plaintiff was struggling to escape from the officer's grasp and did not physically attack the officer. Officer Painter had been an amateur boxer, was physically active and obviously still recalled how to throw a punch. Plaintiff was a sedentary, older storekeeper.

(15) Ms. Veazey testified that Pasqua, after her father's injury, took her to the police station where she was charged with resisting arrest, simple battery and disturbing the peace. She apparently pled guilty and paid a fine.

## D. AS TO OFFICER GONZALES

(16) As soon as the remainder of the crowd saw what had happened to Mr. Braud, the crowd became vocal. Officer Painter, an acting sergeant, called upon Officer Glen Gonzales, who had stopped his vehicle and was standing close by. Painter instructed Gonzales to assist him in removing Braud from the area. Braud was unconscious, and the officers placed their hands under his armpits and dragged him across the curb and across the concrete street, without attempting to lift his knees off the pavement. As a result, plaintiff's knees were scraped and he has permanent scars of both knees, but no other disability caused by the dragging.

## E. AS TO THE UNKNOWN DOOR SLAMMER

(17) Officers Painter and Gonzales left Mr. Braud unattended and helpless on the ground near a police car. Subsequently, several unidentified police officers at the scene placed him into the back seat of the police car. Without checking to insure that the plaintiff was completely in the car, one of the officers slammed the door on plaintiff's right ankle causing the ankle to be fractured. The evidence is unclear as to which officer slammed the door and none has been willing either to accept responsibility or to identify the unknown door slammer. Mr. Braud was then transported to the police station in a vehicle operated by Officer Gonzales, where he was examined by Glynn LeBlanc, a certified medical technician.

## F. SUBSEQUENT EVENTS

(18) The plaintiff's son, Mark, followed the police car to the police station, where he answered questions on behalf of his

father because his father was unable to respond. Plaintiff's son testified that he was in the police station answering questions for ten to twenty minutes. He further testified that the plaintiff was completely confused and not fully conscious. Following examination by Officer LeBlanc, Mr. Braud was transported to East Ascension Hospital in Gonzales. The plaintiff required assistance to walk to the police car to be transported to the hospital. Upon arrival at the Ascension Hospital, medical personnel determined that the plaintiff had a skull fracture and arranged for him to be transported by ambulance to Our Lady of the Lake Hospital in Baton Rouge.

(19) Plaintiff claims that Officer Painter used excessive force under the circumstances, and that as a result, plaintiff has sustained serious injuries. Plaintiff also claims that the officers were negligent in dragging him across the pavement and in allowing the car door to be slammed on his ankle.

(20) As a result of the blow to the head and subsequent contact with the pavement, Mr. Braud suffered a fractured skull and brain damage to the frontal lobes of the brain. Mr. Braud is still undergoing therapy for treatment of the frontal lobe condition. As a further consequence of the blow, Mr. Braud sustained damage to the olfactory nerve and has suffered a loss of the sense of smell. Mr. Braud's knees are permanently scarred as a result of being dragged across the pavement, and the fractured ankle required surgery to set the bone with a metal plate and screws. The fractured ankle also required Mr. Braud to be on crutches for several months.

### G. FACTS AS TO THE REMAINING DEFENDANTS

(21) There is no evidence which would indicate that Chief of Police Barney Arceneaux was personally involved in the incident with Mr. Braud or that he was even aware of it until it was all over. Chief Arceneaux required that every police officer, including the defendants in this action,

successfully complete the basic law enforcement training course required by state law.[3] Plaintiff's expert witness offered the opinion that there are deficiencies in the training and operating procedures of the police department, particularly in record keeping. There is no factual evidence, however, that Mr. Braud's injuries were caused by inadequate training, or supervision or training of any of the officers involved in this case. Neither is there sufficient evidence to support plaintiff's claim that Chief Arceneaux failed to properly train and supervise his officers or that Officers Pasqua, Painter and Gonzales were engaged in the execution of some policy or custom of the City of Gonzales.

(22) Officers Bill Wade and Glynn LeBlanc were simply in the area at the time of the incident and there is no evidence which links them to any injury sustained by Mr. Braud. One of them may have been the unknown door slammer, but there is no evidence upon which to base such a finding.

### H. PRESENT CONDITION OF THE PLAINTIFF

(23) Because of the injuries which he has sustained, Mr. Braud has difficulty managing his grocery business; his brain injury has caused loss of short term memory and loss of the sense of smell, both of which are permanent losses. The brain injury has also caused a "flattening" of plaintiff's personality, a reduction in cognitive tracking ability, integration of information ability, reduction in judgment and reasoning, as well as frustration and depression.

(24) Prior to trial, plaintiff entered a settlement agreement with the City's automobile liability insurer, Commercial Union Insurance Company, under the terms of which plaintiff received $80,000 and released the insurance company from liability—about which more will be said later.

### CONCLUSIONS OF LAW

This court has jurisdiction over this action under the provisions of 28 U.S.C.

---

**3.** La.R.S. 40:2405 requires that every local deputy or municipal police officer complete a basic

law enforcement training course conducted by an accredited training center.

§ 1343 and of the pendent state law claims under *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### A. THE CLAIMS ARISING UNDER 42 U.S.C. § 1983

In *Graham v. Connor,* —— U.S. ——, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court made it "explicit" that, "*[A]ll* claims that law enforcement officers have used excessive force—deadly or not— in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard. . . ." 109 S.Ct. at 1871. Moreover, "As in other Fourth Amendment contexts, . . . the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 1872.

The Fifth Circuit has "clarified" *Graham* so as to require that, "an injury actionable under a fourth amendment standard must be 'significant'." *Brown v. Glossip,* 878 F.2d 871, 873 (5th Cir.1989); see also, *Johnson v. Morel,* 876 F.2d 477 (5th Cir.1989) *en banc.* While the Court of Appeals has so far offered scant guidance for the district courts as to a criterian with which to gauge "significant" injuries, there can be no doubt that plaintiff's head and ankle injuries are "significant" by any standard.

■ It is clear that vicarious liability does not attach to a municipality under § 1983. *Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Monell v. New York City, Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipality may be held liable for acts of individual officials only when their acts were in the execution of some official policy or custom which represents the official policy of that municipality. Id.

In *Rodriguez v. Avita,* 871 F.2d 552 (5th Cir.1989), the court discussed the jurisprudence allowing a plaintiff to state a claim under 42 U.S.C. § 1983 against a municipality for inadequate police training. In *Rodriguez,* the court held that plaintiff had failed to state a claim for municipal liability based on inadequate training under the test enumerated by the Supreme Court in *Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), which was cited with approval by the Court in *City of Canton, Ohio v. Harris,* —— U.S. ——, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). In *City of Canton, Ohio,* the court held:

> that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.

*Id.* at 109 S.Ct. 1204.

The *City of Canton, Ohio* court cited with approval Justice Brennan's plurality opinion in *Pembaur v. Cincinnati,* 475 U.S. 469, 483–484, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986), which found that § 1983 municipal liability only attaches where " 'a deliberate choice to follow a course of action is made among various alternatives' " by the policy makers of the city. *City of Canton, Ohio,* 109 S.Ct. at 1205.

■ While supervisory officials may incur liability under § 1983 without personal involvement in the particular act of the subordinate, there must be evidence establishing improper training or supervision of the subordinate officers so as to constitute a breach of the duty owed by the superior. *Beverly v. Morris,* 470 F.2d 1356 (5th Cir. 1972). A supervisory officer may not be held liable under a vicarious liability theory standing alone. *Reimer v. Smith,* 663 F.2d 1316 (5th Cir.1981).

In *Hinshaw v. Doffer,* 785 F.2d 1260 (5th Cir.1986), the court enunciated the test for imposing liability on a police chief under § 1983. In *Hinshaw,* the plaintiff alleged that the police chief was liable under § 1983 for failing to supervise or train an officer under his control. The court found that § 1983 does not impose liability on a

chief of police under a respondeat superior or vicarious liability theory. *Hinshaw,* 785 F.2d at 1263, citing *Reimer v. Smith,* 663 F.2d 1316, 1323 (5th Cir.1981). The *Hinshaw* court found that:

> For a police chief to incur section 1983 liability he 'must either be personally involved in the acts causing the deprivation of an individual's constitutional rights, or there must be a causal connection between an act of the police chief and the constitutional violation sought to be redressed.'

*Hinshaw,* 785 F.2d at 1263, quoting *Harvey v. Andrist,* 754 F.2d 569, 572 (5th Cir. 1985) (remaining citations omitted).

The *Hinshaw* court went on to state that in order to impose liability on the police chief for failure to supervise or train an officer properly, the plaintiff must show: (1) the police chief failed to supervise or train the officer, (2) a causal connection existed between the failure to supervise or train and the violation of the plaintiff's rights, and (3) such failure to supervise or train amounted to gross negligence or deliberate indifference. *Hinshaw,* 785 F.2d at 1263.

■ It is axiomatic that in order for a claim to be cognizable under 42 U.S.C. § 1983, plaintiff must show a deprivation of constitutional dimensions. *Lewis v. Woods,* 848 F.2d 649, 652 (5th Cir.1988). In this regard, a showing of mere negligence will not suffice. *Daniels v. Williams,* 474 U.S. 327, 328–29, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986). "[T]he Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." *Id.*

Applying these legal principles, we turn to the issue of liability under § 1983 of the several defendants.

1. Liability of Officer Pasqua

■ This altercation certainly began with a violation of § 1983 because Officer Pasqua arrested Ms. Veazey without lawful cause. The court has found that there was no obscene gesture made by Ms. Veazey but even if there had been, Ms. Veazey did not cause a disturbance of the peace. The deputy sheriff on horseback, to whom the gesture allegedly was directed, according to Officer Pasqua, rode on off and ignored it. The disturbance was created by Officer Pasqua, not Ms. Veazey, when the officer seized her arm and yelled that she was under arrest. There was certainly no greater battery in Ms. Veazey's tapping Officer Pasqua on the shoulder than there was in Officer Pasqua tapping her on the shoulder. As to resisting arrest, it is well settled that one is entitled to resist an unlawful arrest. *United States v. Di Re,* 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948).

■ There was no probable cause for Officer Pasqua to arrest Ms. Veazey, but she is not a party to this action and Officer Pasqua did not arrest Mr. Braud. Accordingly, Officer Pasqua has committed no § 1983 violation which is cognizable in this litigation.

2. Liability of Officer Painter

■ It is clear from the evidence that Officer Painter used objectively unreasonable force in arresting Mr. Braud. This arrest occurred at the end of an extended social hour to which plaintiff and the others had been invited. There was no mob, although there was still a sizeable crowd. The mood of the crowd, prior to Mr. Braud's injury, was happy and carefree, as opposed to hostile or dangerous. Officer Painter knew Mr. Braud, knew that he resided in Gonzales, and knew that he operated a local business. Officer Painter was well aware that he was much larger and physically stronger than Mr. Braud, that Mr. Braud was unarmed and that Mr. Braud posed no threat of physical harm to either the officer or anyone in the vicinity. Officer Painter was also aware that Mr. Braud was attempting to escape from his grasp, not attempting to assault him. The punch thrown by Officer Painter was the excessive use of force. As noted earlier, the head injury was and is "significant."

Officer Painter is therefore liable to plaintiff under § 1983 for the head injury caused by his blow to Mr. Braud's head.

Painter's part in dragging the unconscious and helpless plaintiff across the street was simple negligence, which does not give rise to § 1983 liability. There is no evidence which would indicate that Painter was the unknown door slammer.

3. Liability of the Other Defendants

Officer Gonzales assisted Officer Painter in dragging plaintiff across the pavement but that conduct does not amount to § 1983 liability.

There is no evidence that Officers Wade or LeBlanc had any involvement in causing any injury to plaintiff.

The evidence is insufficient to establish that Chief Arceneaux improperly supervised or inadequately trained his officers or that Painter was executing some official policy of the town when he hit Mr. Braud. Accordingly, there is no § 1983 liability upon the town [4] or upon any other defendant except Painter.

### B. THE PENDENT STATE LAW CLAIMS

Plaintiff has alleged that the officers were negligent under Louisiana law.

The operative language of Article 2315 of the Louisiana Civil Code reads as follows: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." Under Louisiana law, article 2315 provides the basis for negligence. "Fault is a breach of duty owed by one party to another under the particular facts and circumstances of a given case." *Broussard v. Northcott Exploration Co., Inc.*, 481 So.2d 125, 128 (La.1986). Unlike federal liability under § 1983, Louisiana law does impose vicarious liability upon a municipality for the excessive use of force by a police officer in effecting an arrest. La.C.C. art. 2320; *Taylor v. City of Baton Rouge*, 233 So.2d 325 (La.App. 1st Cir.1970); see also, *Lamkin v. Brooks*, 498 So.2d 1068 (La.1986);

*LeBrane v. Lewis*, 292 So.2d 216 (La.1974); *Applewhite v. City of Baton Rouge*, 380 So.2d 119 (La.App. 1st Cir.1979).

In order to effectuate a lawful warrantless arrest, an arresting officer must have probable cause as a matter of federal constitutional law. *Adams v. Thompson*, 557 F.Supp. 405, 410 (M.D.La.1983); citing, *Hamilton v. Chaffin*, 506 F.2d 904 (5th Cir.1975); *Gandy v. Panama City*, 505 F.2d 630 (5th Cir.1974); and, *Martin v. Blackburn*, 581 F.2d 94 (5th Cir.1978). Under this burden to prove probable cause, the defendant must "demonstrate that at the moment each of these arrests was made, the facts and circumstances within his knowledge were sufficient to warrant a prudent man in believing that plaintiffs had committed or were committing an offense." *Thompson*, 557 F.Supp. at 410; citing, *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); and, *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

Because there was no probable cause for the arrest, Ms. Veazey and plaintiff were entitled to resist the arrest under both federal and state law. See, *United States v. Di Re*, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948); *Adams v. Thompson*, 557 F.Supp. 405, 411 (M.D.La.1983) (Bystander's activities assisting plaintiff in resistance of unlawful arrest could not provide probable cause for bystander's arrest); *State v. Lindsay*, 388 So.2d 781, 782 (La. 1980); *Fontenot v. Fontenot*, 499 So.2d 958, 961 (La.App. 3d Cir.1986); *State in the Interest of W.B.*, 461 So.2d 366, 369 (La. App. 2d Cir.1984).

1. Liability of Sergeant Pasqua

As to the liability of Sergeant Pasqua for the ultimate injuries to Mr. Braud, there is some question concerning whether

---

4. Gonzales is governed by the Lawrason Act and under La.R.S. 33:381 the Chief of Police is an elected public official whose duties are prescribed by La.R.S. 33:423. The court expresses no view as to the effect that an elected officer might have either upon the liability of the chief for acts of his officers or upon the liability of the town for actions or non actions of the chief.

it was forseeable to Sergeant Pasqua that Officer Painter would intervene and hit Mr. Braud. This question gives rise to another question, namely, whether forseeability is a proper factor for consideration under the duty-risk analysis employed by Louisiana courts. While the parties have not broached this subject, the court finds that it is appropriate for consideration in determining the liability between the remaining defendants.

Formerly, under Louisiana law, forseeability was an element of proximate cause, an essential element of plaintiff's negligence case. The two part analysis of proximate cause included (1) whether the accident and resulting damages were the natural and probable consequence of defendant's actions, and (2) whether the results of defendant's actions were reasonably forseeable. *LeBoeuf v. Gulf Oil Corp.,* 634 F.2d 261, 262 (5th Cir.1981); citing, *Traders & General Ins. Co. v. Robison,* 289 So.2d 178, 183 (La.App. 1st Cir.1973); and, *Craig v. Burch, d/b/a Burch Tire Co.,* 228 So.2d 723, 729 (La.App. 1st Cir.1969).

Since the advent of the duty-risk analysis,[5] the four factors considered in determining negligence by Louisiana courts are:

(1) Was the conduct in question a cause-in-fact of the resulting harm?

(2) What, if any, duties were owed by the respective parties?

(3) Were the requisite duties breached?

(4) Was the risk, and harm caused, within the scope of protection afforded by the duty breached?

*Mart v. Hill,* 505 So.2d 1120, 1122 (La. 1987).[6]

There can be little doubt that Pasqua's actions amount to a cause-in-fact of the injuries to Mr. Braud. Had Pasqua not illegally arrested plaintiff's daughter, Mr. Braud would not have intervened and had Mr. Braud not intervened, there would have been no occasion for Officer Painter to hit him, knocking him unconscious, and no occasion to drag him across the pavement and no occasion for the ankle to be injured by the unknown door slammer. Cause-in-fact, however, does not equate to liability.

The next issue is the question of duty which is a legal, not a factual matter. Surely, there is a general principle of law that police officers ought not to arrest citizens without probable cause and surely that principle extends to protect the person being arrested from harm as a result of the arrest. A much closer question arises as to whether the police officer's duty to not arrest without probable cause extends to protect other persons from harm caused independently by another police officer in the vicinity, particularly where the second police officer causes injury by the use of

---

**5.** The undersigned is greatly indebted to a friend since law school days, Professor William L. Crowe, Sr., for a brace of law review articles on the duty-risk analysis. See Crowe, *The Anatomy of a Tort—Greenian, As Interpreted By Crowe Who Has Been Influenced By Malone—A Primer,* 22 Loy.L.Rev. 903 (1976) and Crowe, *The Anatomy of a Tort—Part V Apportionment, Contribution, and Indemnity Among Multiple Parties in the Area of Damages—A Second Reader,* 35 Loy.L.R. 351 (1989). Both articles have been helpful in this and other areas of this opinion. The analysis employed in this case, however, is my own, and no blame should attach to Bill Crowe if the Fifth Circuit disagrees with me.

**6.** Professor Crowe refines the inquiry as follows:

I. *Causation-in-Fact*—Factual Determination

A. Did the defendant *contribute* to the plaintiff's harm or is the defendant *a* cause of the plaintiff's harm?

II. *Duty*—Legal Determination

A. Can the plaintiff articulate some general rule or principle of law (either statutory or jurisprudential) that protects his interests?

B. Is that rule or principle of law intended to protect:

1. This plaintiff or a general class to which he belongs?

2. From this type of harm (person, property, pocketbook, mental well-being, or relational interest)?

3. Arising in this manner?

C. Intervening Cause

1. Is there an intervening cause which is deemed superseding?

III. *Violation of Duty/Negligence*—Factual Determination

A. Did the defendant in fact violate the duty owed? In the area of negligence, the question is: Did the defendant act unreasonably?

B. Affirmative Defenses

excessive force. Some other type of injury to Mr. Braud might well be included within the duty owed by Sergeant Pasqua but the court here concludes that Officer Painter's use of excessive force was an intervening cause of the head injury to plaintiff which supersedes any duty owed to plaintiff by Officer Pasqua. While the call is a close one, the court concludes that Officer Pasqua is not liable under state law for the head injury or any of the subsequent injuries sustained by Mr. Braud.

### 2. Liability of Officer Painter

■ Painter's blow was a cause-in-fact of the head injuries and Painter clearly violated his duty not to use excessive force in making an arrest. Painter is clearly liable for the head injury.

■ Painter then enlisted the aid of Officer Gonzales to drag the helpless plaintiff across the concrete street, causing permanent scarring of the knees. Cause-in-fact of the knee injuries is obvious. A police officer who renders a citizen unconscious and helpless certainly owes him a duty not to cause him further injury while he is helpless. There can be no doubt that Officer Painter violated that duty by dragging Mr. Braud across the street. Officer Painter has implied that it was urgent that Mr. Braud be removed because the mood of the crowd became hostile after he knocked Mr. Braud unconscious. The answer to that assertion is that the crowd was not hostile to Mr. Braud, in fact several people attempted to help him but were prevented from doing so by the police officers in the vicinity. If it had been imperative to move the helpless man, then there were many police officers in the area upon whom Painter could have and should have called for assistance to carefully move Mr. Braud without causing additional injury. Painter is clearly liable for the injury to the knees.

■ Painter and Gonzales left Mr. Braud on the ground, helpless and without attention. Painter made no call for medical treatment and did not inform other officers on the scene that Mr. Braud had suffered injury.

Enter the unknown door slammer who subsequently fractured Mr. Braud's ankle by slamming the door upon it.

Painter's action in rendering Braud unconscious was a cause-in-fact of the ankle injury because had Mr. Braud been conscious, he could have placed himself safely into the vehicle. Because Painter was himself the instrument who rendered Mr. Braud helpless, Painter's duty to protect the helpless man extended to protection from harm caused by others who did not carefully place him into the vehicle and caused additional injury. Painter violated this duty by leaving Mr. Braud helpless upon the ground.

Painter is therefore also liable for the ankle injury to the extent, if any, there remains liability in this case in view of the release which has been executed.

### 3. Liability of Officer Gonzales

■ Officer Gonzales was a reserve officer who happened to drive upon the scene. At Painter's request, he helped Painter drag Mr. Braud across the street. His action was a cause-in-fact of the knee injuries. Gonzales certainly owed a duty in moving a helpless person to do so without causing further injury and Gonzales clearly violated that duty. Gonzales is liable for the knee injuries, along with and for the same reasons as Painter.

■ Gonzales, however, had no part in causing Mr. Braud's condition of helplessness and, as a reserve officer, had no authority over Painter, a regular, full-time police officer. While Gonzales had a duty to not cause further injury to Mr. Braud, that duty did not extend to the risk that others would cause Mr. Braud further injury. Had Gonzales caused the helpless condition or had he been a superior officer, the result would be different, but Gonzales is not liable for the ankle injury.

### 4. Liability of the City of Gonzales

■ The City of Gonzales, as the employer of the officers, is liable in solido with Painter for the head injuries and is liable in solido with Painter and Gonzales for the knee injuries and is liable in solido

(but for the release) with Painter for the ankle injuries.

 5. None of the other defendants is liable under state law.

 6. Effect of the Settlement and Release

The release document is not a model of clear and precise legal drafting. For example, the first paragraph acknowledges receipt by Mr. Braud of $80,000 paid by Commercial Union for which, "full discharge and acquittance [is] hereby given, in settlement and compromise of *any and all ... claims for personal injury ... arising out of an accident* which occurred ... *while ... Braud was attending the Jambalaya Festival....*" (emphasis supplied). That language leads defendants to argue that plaintiff has released everyone for all injuries sustained at the festival.

The next paragraph of the release provides, however, that plaintiff, "... releases and forever discharges the said Commercial Union Insurance Company, *only* ... and whomever they (sic) are liable for under their auto liability policy issued ... to the City ... of, from and for any and all claims ... which are held to fall under the above mentioned auto liability policy...." (emphasis supplied). The release then acknowledges that the insurance company has denied coverage under the policy and provides, "The parties hereto agree that if the issue of coverage were to be decided adversely to Commercial Union Insurance Company then, coverage would extend *only* to damages arising out of the injuries sustained to the right lateral malleolus of John Hubert Braud." (emphasis in the original).

Finally, the document provides that plaintiff:

> [D]oes not release any person who might be considered an insured of Commercial Union Insurance Company except to the extent that any judgment against them (sic) is held to fall under the above-referenced automobile liability policy, and in particular, does not release and does reserve all rights against Glen Paul Gonzales, Bill Wade and Glynn Paul LeBlanc. The scope of this reservation

of rights extends to Charles Painter, Bill Wade, Sam Pasqua, Glynn Paul LeBlanc, Glen Gonzales, Barney Arceneaux, the Town of Gonzales, any other entity which may provide insurance coverage to any party liable for Appearer's injuries, and all other persons, it being expressly the intent of Appearer that this release and transaction and compromise operate only as to Commercial Union Insurance Company.

Considering all of the provisions of the release, as we are required to do by Louisiana law, [See La.Civ.Code art. 2050 and *Franks Petroleum, Inc. v. Mayo*, 438 So.2d 696, 699 (La.App. 2d Cir.1983).], the court comes to the following conclusions regarding the release:

 1. It was the intent of the parties that the insurance company be released from any and all liability for anything that might have occurred to Mr. Braud at the Jambalaya Festival.

 2. It was the intent of the parties to release any person who might constitute an insured under the policy if the court should hold that the policy did provide coverage.

 3. It was plaintiff's intent to release all such insureds only for the injury to his ankle.

 4. It was plaintiff's intent to reserve all rights as to all other persons who may have caused him injury, including the injury to the ankle.

Whether there would have been coverage under the policy depends upon whether plaintiff sustained an injury caused by the "use" of a motor vehicle.

■■■■ The court concludes that the ankle injury was a result of the negligent use of an automobile in the transportation of a prisoner. Louisiana courts have held that an injury caused by slamming a motor vehicle door is an injury caused by the "use" of an automobile. *Bolton v. North River Ins. Co.*, 102 So.2d 544 (La.App. 1st Cir. 1958); *See, Green v. DeFelice*, 466 So.2d 1373, 1378 (La.App. 3d Cir.1985); *See also, Tolleson v. State Farm Fire and Cas. Co.*, 449 So.2d 105, 108 (La.App. 1st Cir.1984)

("a car door slamming, a parked car blocking the view, and the breaking of a window to gain entry into the car are all activities which can be easily characterized as 'uses' of the car").

Thus, had there been no release, Painter and the City, in its capacity as the employer of the unknown door slammer, would have been liable in solido for the ankle injuries, along with the insurance company. Neither the City nor the insurance company is a tort feasor—one is liable vicariously and the other contractually. The tort feasors as to the ankle are Painter and the unknown door slammer. They are not joint tort feasors in the traditional sense, since Painter did not close the door on Mr. Braud's ankle. Painter's solidary liability with the unknown door slammer is predicated upon a line of Louisiana cases holding the original tort feasor liable in solido along with those who cause additional injury to the victim. See *Weber v. Charity Hospital of Louisiana*, 475 So.2d 1047 (La. 1985); *Narcise v. Illinois Central Gulf R.R. Co.*, 427 So.2d 1192 (La.1983); *Erdey v. American Honda Co., Inc.*, 415 So.2d 449 (La.App. 1st Cir.1982).

The insurance company and all of its insureds under the policy have been released by the settlement and release. Thus, the City (the named insured) and the unknown door slammer have both been released. Painter was not released because he was not an "insured" under the policy. Painter's actions had nothing to do with the use of the automobile and, although he would have been liable in solido with the door slammer for the ankle injury, Painter was not an insured. Hence, Painter's liability for the ankle has not been released.

The other tort feasor (the door slammer) clearly was an insured under the policy and clearly has been released by the compromise and release. Accordingly, Painter's solidary co-obligor has been released. Under Article 1803 of the Louisiana Civil Code, as amended, effective January 1, 1985, release of one obligor "benefits the other solidary obligors in the amount of the portion of that obligor." Article 1804, as amended, provides that among solidary obligors each is liable for his virile portion and that in tort cases, "a virile portion is proportionate to the fault of each obligor." Accordingly, Painter will benefit from the release of his co-obligors only to the extent of the fault of each. See *Joseph v. Ford Motor Co.*, 509 So.2d 1 (La.1987); *Antley v. Yamaha Motor Corp., U.S.A.*, 539 So.2d 696 (La.App. 3d Cir.1989).

As noted earlier, neither the insurance company nor the Town was "at fault," so their release gains Painter nothing. The release of the unknown door slammer benefits Painter, however, to the extent of the fault of the door slammer. The court fixes the fault of the unknown door slammer at ninety percent as to the ankle injury. That conclusion is predicated upon the notion that any police officer who is dealing with a helpless man ought to know enough to carefully see to it that the door can be closed without causing additional harm before closing the door.

*Damages*

Although the court has made several false starts on the question of separate awards for the several injuries to Mr. Braud, the final conclusion is that each injury was separately sustained and should be separately assessed even though all contribute to plaintiff's present disabilities. It is a central tenet of modern Louisiana tort law that each defendant is liable only for the injury he caused, where there is a rational basis for separating the injuries. *Weber v. Charity Hospital of Louisiana*, 475 So.2d 1047 (La.1985); *Sickinger v. New Orleans Public Service, Inc.*, 524 So.2d 93 (La.App. 4th Cir.1988); *Hess v. Sports Pub. Co.*, 520 So.2d 472 (La.App. 4th Cir.1988); *Probst v. Wroten*, 433 So.2d 734 (La.App. 5th Cir.1982); *McCreary v. Commercial U. Ins. Co.*, 372 So.2d 745 (La.App. 4th Cir. 1979). The factual and expert medical evidence is sufficient to separate the head, knee and ankle injuries, respectively.

Plaintiff has sustained serious personal injuries. The blow to the head, and subsequent fall to the pavement caused a linear fracture of the skull. Mr. Braud also suffered bifrontal lobe damage, which has resulted in memory problems, and has caused

a change in plaintiff's personality. Furthermore, plaintiff suffered damage to the olfactory nerve, which resulted in a loss of the sense of smell.

As to the knee and ankle injuries, plaintiff sustained lacerations to both knees, which have produced scarring of the knees. Plaintiff also sustained a fractured ankle, which required surgical insertion of a metal plate. The leg was placed in a cast, and Mr. Braud was forced to walk on crutches for several months. While plaintiff continues to have some disability at this time, the treating orthopaedic surgeon testified by deposition that he expected an almost complete recovery, and assigned a current disability of five (5%) percent of the lower extremity to the ankle.

Mr. Braud was unable to work for several months following his release from the hospital. Plaintiff also claims that he has been unable to resume his full range of duties at the grocery store. Plaintiff contends that his inability to work at the same level that he did before the injury has resulted in a loss of profits at the store. Defendants claim that Mr. Braud's economic losses are due to a general downturn in the economy, and to the fact that several new establishments have opened in the area. There is also evidence that plaintiff has been involved post-injury in operating a furniture store in addition to his operation of the grocery store.

 Plaintiff's medical expenses have been stipulated at $12,902.55. The court finds that the plaintiff is entitled to recover the cost of medical treatment. The court further finds that plaintiff's injuries resulted in lost profits from the grocery store. The court finds that plaintiff is entitled to recover lost profits in the amount of $25,603 to date of trial. Plaintiff's experts also established that further rehabilitation would be required in order to further reduce the effects of the injury. While the parties do not agree on the costs of rehabilitation, the court finds that the average cost of inpatient rehabilitation is $56,000 based on expert testimony that three to six months is required (five month period, $18,000 for the first month, $9,500 for each

additional month). Additionally, the court finds that one year of outpatient therapy is necessary, at a cost of $6,760 (based on expert testimony that two or three one hour sessions per week are required for one year, at a cost of $50–$80 per hour—$130 per week for 52 weeks).

 Plaintiff presented evidence at trial that a full-time manager would have to be hired to manage the store at a total cost of $14,400 per year for the remainder of plaintiff's work life expectancy. Plaintiff's expert economist established the work life expectancy at nine years, for a total award of $122,098 (including cost of living adjustment). Defendants argue that if plaintiff is to undergo rehabilitation, it should not be necessary to hire a full-time manager. However, while the expert testimony indicates that Mr. Braud's condition should improve with the aid of therapy, he will still have to have full-time help both during the course of therapy, and after the completion of therapy. Plaintiff has suffered permanent and irreversible brain damage. While therapy may enable him to compensate for the loss in some respects, plaintiff will still require assistance to operate a business. Therefore, the court finds that based on the testimony, an award of $122,098 is sufficient to ensure that Mr. Braud will be able to afford the necessary managerial assistance for the remainder of his work life expectancy. Because there is recovery for the cost of a manager, no loss of future profits is due.

The final damages issue concerns the calculation of appropriate general damage awards.

The injuries to the knees and the ankle, while serious and painful for a temporary period, are not sufficient to interfere with Mr. Braud's operation of his business. The scarring of the knees and the slight permanent impairment of the ankle, standing alone, would be no impediment to the operation of the retail establishment. The brain damage is much more serious.

 In this court's view, awards of $30,000 for the ankle injury and $5,000 for the knee injury represent ample general damages for those injuries.

Plaintiff submits that an award of not less than $750,000 would be appropriate. Defendants argue that plaintiff is entitled to no more than $110,000 in general damages. Both parties have briefed the issue, and cited cases where damages have been awarded for similar injuries. There is a great disparity in the figures set forth in the cases. Plaintiff argues that an award of $400,000 to $800,000 is appropriate to compensate for the head injury alone.

The court concludes that an award of $400,000 for the head injury is appropriate for general damages.

Accordingly, there will be judgment in favor of plaintiff, John Hubert Braud, as follows:

1. Under 42 U.S.C. § 1983 against defendant, Charles Painter, for the head injury:

| | |
|---|---|
| Medical expense | $ 12,902.55 |
| Lost Profits | $ 25,603.00 |
| Rehabilitation expense | $ 62,760.00 |
| Cost to hire manager | $122,098.00 |
| General damage | $400,000.00 |
| Total | $623,363.55 |

2. Under state law against defendant, Charles Painter and his employer, the City of Gonzales, in solido for the head injury in the amount of $623,363.55.

3. Against defendant, Charles Painter, and defendant, Glen Gonzales, and their employer, the City of Gonzales, in solido in the amount of $5,000.00 for injuries to the knees.

4. Against defendant, Charles Painter, in the amount of $3,000.00 ($30,000 times 10%) for the ankle injury. This award is only against Painter because the City and all other insureds have already been released for the ankle injury.

All sums will bear legal interest from date of judicial demand until paid and plaintiff is entitled to recover attorney's fees for prosecution of the head injury claim only. Counsel shall submit appropriate documentation.