433 So.2d 734 (1982)
Francis Dargis, Wife of/and William F. PROBST
v.
Ronald J. WROTEN, Rebecca Wroten, and State Farm Mutual Automobile Insurance Company.
Frances Dargis, Wife of/and William F. PROBST
v.
Ralph H. HALES and State Farm Mutual Automobile Insurance Comp.
Nos. 5-100, 5-101.
Court of Appeal of Louisiana, Fifth Circuit.
December 9, 1982.
On Rehearing June 6, 1983.
*735 Dalton, Gillen & Roniger, Gregory W. Roniger, Jefferson, for plaintiffs-appellees.
Bienvenue, Foster, Ryan & O'Bannon, David E. Walle, New Orleans, for State Farm Mut. Auto. Ins. Co., defendant-appellant.
Before SAMUEL, CURRAULT and DUFRESNE, JJ.
SAMUEL, Judge.
Plaintiffs, Mrs. Francis Probst and William P. Probst, husband and wife, filed suit (our Docket # 5-100) against Ronald J. Wroten, Rebecca Wroten, his mother, and State Farm Mutual Automobile Insurance Company, the uninsured motorist carrier of the Probst automobile, for injuries sustained by plaintiff wife, and on behalf of the husband for medical expenses and property damage sustained by the community as the result of a collision which occurred on October 31, 1976.
Subsequently, plaintiffs filed another suit (our Docket # 5-101) against Ralph Hales and State Farm Mutual Automobile Insurance Company, again under State Farm's uninsured motorist coverage, for injuries sustained by the wife as a result of a second accident which occurred a year later, on October 28, 1977.
The cases were consolidated and, after a trial on the merits, a single judgment was rendered in favor of Mrs. Francis Probst against all four defendants in the sum of $330,899.32 and in favor of William Probst for medical expenses in the sum of $7,113.54.
State Farm has appealed. The awards to Mrs. Probst for her injuries and loss of wages are the only matters at issue in the appeal.[1] As the other defendants have not appealed, the judgment against them is not before us.
At the time of the first accident, October 31, 1976, plaintiffs were insured by State Farm under three separate policies, each *736 providing uninsured motorist coverage in the sum of $100,000. The trial court held that these policies could be "stacked" so that the total uninsured motorist coverage was $300,000. At the time of the second accident, October 28, 1977, plaintiffs were only insured by State Farm (in only one policy) for uninsured motorist coverage in the sum of $100,000. Plaintiffs' underlying theory in both actions is that because Mrs. Probst had not fully recovered from the injuries of her first accident when the second accident occurred, plaintiffs were covered by stacking for the total sum of $400,000 for both accidents. The trial court agreed and so held.
State Farm contends the trial judge committed error by "stacking" the three $100,000 uninsured motorist coverages for the first accident. It points out that Act 623 of 1977 amended R.S. 22:1406(D)(1) to eliminate stacking. Act 623 became effective September 9, 1977, subsequent to the first accident. Without citation of authority, defendant suggests that public policy dictates retroactive application of Act 623 of 1977. However, our consistent jurisprudence is that this amendment to the uninsured motorist statute is not to be given retroactive effect.[2] The trial judge did not commit error by allowing stacking of coverage for plaintiff's first accident.
The primary issue for this court's determination is whether the rendition of one judgment against all defendants, instead of considering the separate effects of each accident and rendering separate awards for each accident, was erroneous.
The trial judge held the evidence established that the wife's injuries were medically inseparable and the independent acts of the two uninsured motorists concurred to produce plaintiff's injuries and damages. In reaching this conclusion, and in rendering a single judgment against all defendants, the judge relied on the following quotation from Prosser, Law of Torts, (2d Ed) p. 26 (as quoted in his Reasons for Judgment):
"Once it is determined that the defendant's conduct has been a cause of some damage suffered by the plaintiff, a further question may arise as to the portion of the total damage sustained which may properly be assigned to the defendant, as distinguished from other causes. The question is primarily not one of the fact of causation, but of the feasibility and practical convenience of splitting up the total harm into separate parts which may be attributed to each of two or more causes. Where a logical basis can be found for some rough practical apportionment, which limits a defendant's liability to that part of the harm which he has in fact caused, it may be expected that the division will be made. Where no such basis can be found and any division must be purely arbitrary, there is not practical course except to hold the defendant for the entire loss, notwithstanding the fact that other causes have contributed to it.
The distinction is one between injuries which are reasonably capable of being divided, and injuries which are not."
He further relied on the following quotation from the testimony of Dr. Russell Levy, one of Mrs. Probst's treating physicians:
"But she was never totally well from the first accident so I don't think you can really separate the second accident totally, I think, from the first accident. If she had not been in the second accident, she may have had a chance for recovery to a level that would not have been say before the first accident but I don't think this woman would have been cleared totally. And I think in the future that she probably would have injured one of the discs maybe by just sneezing, maybe just bending over to pick something up, but I do think that the die was cast in her case with her arthritic change and her size. And I think that after the first accident, *737 she probably was set up for a problem with her neck off and on throughout life with a waxing and waning pattern."
Relying on the Prosser quotation and on the quotation from the deposition of Dr. Russell Levy, the trial judge concluded the injuries were medically inseparable and the entire $400,000 of stacked uninsured motorist coverage was available to plaintiffs.
We hold as a matter of law that the trial judge's conclusion was correct insofar as stacking for the first accident and injury are concerned, but incorrect insofar as the second is concerned. The effective date of the anti-stacking statute, Act 623 of 1977, was September 9, 1977, almost two months prior to plaintiff's second accident and injury of October 28, 1977. Therefore, plaintiff could not stack coverages for the second accident and injury. Moreover, a reading of Dr. Levy's testimony indicates the trial court was faced with a classic case of an aggravation by a second accident of a pre-existing injury. His testimony as a whole establishes that plaintiff had not totally recovered from the first accident, and that it, combined with plaintiff's pre-existing arthritic condition, made her "more subject to recurrent injury after the first accident, and probably a lesser injury would cause more severe pathology ...." However, immediately preceding this statement he emphatically stated that "the second accident was a die that really cast this into a surgicaldefinite surgical situation."
The quotation from Prosser relied on by the trial judge concludes with the statement that the distinction is between injuries which are reasonably capable of being divided and those which are not. In our view, the effects of the two accidents in the present case are clearly capable of being divided.[3] Since such division is factually possible, it should be made in view of the policy of Louisiana courts as exemplified in the following quotation from Comeaux v. Barksdale:[4]
"In situations involving multiple accidents, whether preceding or subsequent to the accident at issue, it is well settled that a tortfeasor is liable only for the direct and proximate results of his wrongful act."
In Foret v. United Services Automobile Association,[5] the court stated: "... the principle is well settled that a tortfeasor is liable only for the direct and proximate results of his wrongful acts...."
Unlike the case now before us, the court's decision in Hilburn v. Johnson[6] furnishes an example of those situations in which injuries cannot be divided. In Hilburn, a motorcyclist was gravely injured when he struck the rear of a vehicle. Then he was struck by an automobile. He later died from his injuries, and the court held the second motorist responsible for the total amount of damages:
"We find that if the second accident was not the sole proximate cause it was a contributing cause of the death of decedent and, though there may have been a pre-existing condition, i.e., injuries from the first accident, there was no intervening cause between the second accident and Hilburn's death."
Thus, the Hilburn court did not attempt to distinguish what portion of decedent's injuries was caused by his own act and what portion was caused by the defendant's act. Unlike the present case, there was no substantial period of time between the two acts, and there was no way of dividing those injuries which caused death from those which did not.
Since we have determined the two accidents in the instant case are distinguishable, two separate awards should have been made. In order to determine the proper general damage award for each injury, we have examined the record with particular reference to the medical evidence.
*738 Testimony relative to the medical aspects of the accidents was given principally by Mrs. Probst and (by deposition) her treating physicians, Dr. Russell Levy and Dr. Rudolph Hamsa.
Dr. Levy testified he initially saw plaintiff on November 1, 1976. She had been involved in a rear end accident the previous day and was experiencing pain in the right side of the neck and the right muscle in that area. She had had no previous neck injury or much pain. She had been seen at the hospital emergency room the night before and placed in a cervical collar and put on pain medication.
The doctor conducted a complete physical examination. He found plaintiff had a decreased range of motion. While he could detect no definite spasm, because of her weight (in excess of 200 pounds), he indicated the spasm would not always be palpable.
X-rays showed anterior subluxation, indicating a cervical sprain. She was left on muscle relaxants and pain medication, and, on November 4, was placed on physical therapy. When reexamined on November 10, definite neck spasm was noted. There was decreased range of motion, and additional x-rays showed definite narrowing at C 2-3 and C 3-4. C 5 and C 6 both showed spurs and arthritic change, both of which were pre-existing problems.
On November 24, the patient was doing better clinically. No palpable spasm was noted, but the motion was still decreased. Her pain increased near the extreme in range of motion and whenever she was taken past the general range of motion. The pain medication and muscle relaxers were reduced and she was allowed to start driving again. Continued use of the collar was recommended, but only while driving. Her progress was slow.
On December 8, she had increased tenderness at C 4 posteriorly, but was still improving slowly. On December 30, there was better range of motion in the neck but she had headaches and dizziness. Therapy was reduced to twice a week.
On January 19, 1977 she had increased discomfort and therapy was increased to three times per week. The range of motion was not nearly as good as on the previous examination. Her recovery was a "waxing and waning" pattern which means the pain gets better, flares up, and is worse, but the plateau is a little better than when she started.
On February 18, there was still discomfort, but the improvement was slow. The doctor was concerned because the underlying arthritic change usually indicates there is some degeneration present, and that probably was the reason for her slow recovery.
In March, she had "dull discomfort" and intermittent pain between the shoulder blades. This is frequently due to some nerve root irritation. The range of motion was improved but she was forbidden to engage in any vigorous activity. When examined in May, the range of motion in the neck had decreased. There was some increase in tightness, more on the left than the right, not true spasm but more "splinting (sic)". This was a significant change in pattern, as the muscular pain previously had started on the right. This indicated her nerve was irritated. The doctor was concerned about disc herniation. He felt it would clear as she probably would be off work until August, and not sitting with her neck bent forward would help a great deal because the tension of the job probably increased the problem.
In July she was improved; the range of motion was good. On October 17, he noted continued improvement and she was slowly returning to normal. She was not discharged but told to return in three months. Her problem was a combination of sprain to the ligaments and muscles in the neck area and underlying degenerative arthritic changes. She could continue to work.
On October 31, 1977, she returned complaining of increased pain secondary to being involved in another accident on October 28. In this accident her vehicle was hit in the left rear door spinning her around. She struck her left hip and left shoulder on the *739 door and experienced neck discomfort. Her hip area was bruised and contused, and there was a decreased range of motion in the neck, with slight tightness of the parspinous musculature on the left. Mild arthritic changes were noted in the acromial clavicular joint.
The doctor concluded the second accident aggravated the initial injuries. Her neck complaints were not as severe as they had been initially after the first accident, but they were worse than when the patient was last seen on October 17. Her recovery from the first accident had been slow and progressed satisfactory, but the second accident set back her recovery.
On November 14, plaintiff's condition had changed for the worse. Instead of the slow improvement, she was going in the opposite direction. Her improvement stopped altogether and she went downhill into a tailspin. She had not reached total recovery from the first accident, and the doctor did not know if she ever would have.
On November 28, Mrs. Probst complained of shooting pain down the left arm. The doctor was worried because of the possibility of a compression of a fracture in the thoracic spine he may have overlooked. Her range of motion in the neck was decreased. She was placed on anti-inflammatory medication and returned on December 12, 1977. The neck had not improved much, and there was swelling in the area, or irritation in the bursa, or where the muscle comes over the bone.
The second accident "was the straw that broke the camel's back". On January 5, 1978 she wasn't feeling any better and hospital admittance was indicated. A myelogram was performed on January 16, 1978, which showed disc herniation or rupture at three levels. The myelogram was positive for a disc rupture. The doctor made no decision to operate because the patient wanted to wait, as she did feel a little better on conservative treatment. She was discharged on January 21, but came back ten days later, because she had not improved, but she wanted to finish the school year. She was last seen on February 1, 1978. The doctor concluded surgery was necessary because he did not believe she would improve, but she would not consent to surgery. He refilled her medication by phone on April 20, 1978.
What convinced Dr. Levy that Mrs. Probst needed surgery was she had gotten well, but the pain now was at a significant level and did not show any improvement except while hospitalized and in traction, "which is not a way to live". These did not all originate after the second accident because there were "things going on the whole time". She had had the same type pain, and to a similar degree, in the area of the neck following the first accident which had just started to clear. Her second accident caused the pain to become progressively worse and lessened her chances of recovery which were near in the first accident.
If it had not been for the second accident, Mrs. Probst may have had a chance for recovery to a lesser level than that which she enjoyed before the first accident, but the doctor did not believe plaintiff would have cleared totally [from the first accident]. In the future [without the second accident] she probably would have injured one of those discs just by sneezing or bending over to pick up something. The die was cast with the first accident, her arthritic change and her excessive weight. After the first accident she was "set up" for a problem with her neck throughout life with a waxing and waning pattern. Her main injuries occurred with the first accident from which she never got totally well, but the second accident created the surgical situation. She was subject to recurrent injury after the first accident.
While Dr. Levy did not find evidence of a herniated disc until after the second accident, he thought she probably had some disc injury the first time, and the second accident completed it. Based on physical examination only, there is no way to prove a definite herniated disc, which only became apparent after the myelogram and hospital x-rays. She could not perform heavy labor and surgery at two or three levels would give her about 15% impairment of the body.
*740 Mrs. Probst testified: She was 55 years old at the time of the first accident and had been teaching since 1942. For the past 18½ years she had been principal of an elementary school and retired prematurely due to injuries sustained in the accidents.
Shortly before the first accident in 1976, she had been on sabbatical leave for nine months, which started in June, 1976 and ended in June, 1977. The sabbatical was recommended by a coronary specialist, because she was tired physically and had high blood pressure, which had manifested itself when she was in her late twenties.
After the first accident she sought emergency treatment, and was treated thereafter by Dr. Levy. She was on pain medication and took daily physical therapy, heat pads and massage for six weeks; this was reduced to three times per week and gradually to twice a week until July the following year. She had good and bad days and was restricted in her activities.
After the summer she returned to her job and was on her feet all day. She experienced more pain on a daily basis and was distressed about her physical condition.
After the second accident she became very upset and the condition of her neck and back deteriorated. She was hospitalized in January, 1978, a myelogram was performed and she was placed in traction. The myelogram was a traumatic experience which gave her physical and mental problems. She was hospitalized sixteen days and returned to work two days later.
Dr. Levy recommended surgery but she refused because she had been hypertensive for many years, was very much afraid of spinal surgery, and also wanted to continue to work. Because of her fear of surgery she wanted a second opinion, and consulted Dr. Rudolph Hamsa. He tried conservative treatment and traction.
During the summer months of 1978, she was able to rest, but upon returning to work in August, the activity triggered the amount of pain. Sitting at her desk aggravated her condition; she could not stand for any length of time, and the medication had a sedative effect while she needed to be alert on her job. She is very conscientious and her injuries, coupled with hypertension of 25 years duration, made working very difficult.
Plaintiff consulted a cardiologist for a total physical to find out if she would be a good candidate for surgery. He hospitalized her for five days in October, 1978, and cleared her for surgery if she should so elect. However, she decided to continue conservative treatment with Dr. Hamsa, but her condition got worse and, after discussing retirement with him, he approved and she did retire in January, 1979.
In November, 1979, plaintiff decided surgery was her only alternative. On November 12, 1979 a cervical fusion was performed at C 3-4, C 4-5 and C 5-6, taking bone from the hip to graft on the three discs in the neck. She was discharged November 21, 1979, wore a cervical collar for three months and was bed ridden for three months. There was much leg pain in the area of the hip where the bone was taken.
Plaintiff has improved with surgery but still has pain "off and on", depending upon activity. She is limited in turning her head and has a limp while walking. Her greatest pleasure is reading but she cannot sit for any length of time and has to lie down because of her neck position.
Plaintiff had planned to continue to work until retirement at age 70 but her injuries from these accidents made it impossible. She misses the activity with young people and would like to be able to do tutoring for a few hours a day, or perhaps return to school to study to be a paralegal, but does not know if she would be able to physically tolerate sitting at a desk for several hours two or three days a week.
Dr. Rudolph Hamsa, an orthopedic surgeon, treated plaintiff after her second accident. He saw her on May 24, 1978. She complained of severe headaches, basilar neck pain, interscapular and left subscapular pain and decreased range of motion, and a one month history of tingling on the dorsal on the top part of the left hand. He performed a physical examination and reviewed *741 x-rays. He concluded she had degenerative cervical disease, cervical disc syndrome and hypertension. He continued conservative regimen and tried heavy sedative tranquilizing measures but she felt over-sedated and her school situation created tension. She was seen on several occasions and reacted poorly to some of the medications. She was to continue traction.
In August, 1978, she had a complete recurrence. It became obvious that she was not responding to conservative treatment and she was frightened about having a heart attack, but her situation was such that Hamsa demanded she consider surgery following her cardiac evaluation. She was worried and distressed over the contemplated surgery for two years because of her heart problem but finally submitted to the three surgical fusions in November, 1979. She had an uneventful postoperative course and was an excellent patient. She was discharged with a well fitted cervical brace on November 21, 1979 and given appropriate medication.
Postoperatively, she did well. She was last seen July 30, 1980. At that time she had a pulling sensation in the left thigh from which the donor bone was taken, and x-rays showed her neck at one level had not completely fused. She has a mechanical limitation in range of motion because of the fusion and will have aches with weather changes. Dr. Hamsa did not feel she could return to her job as a school principal because she had a permanent limited range of motion in her neck.
We hold the trial judge did not abuse his discretion in reaching the total damage award made by him to Mrs. Probst. The award of $330,899.32 is comprised of $100,000 in general damages, $196,523 in future lost wages and $34,376.32 in past lost wages (for reasons hereinafter expressed, we find it unnecessary to discuss or decide the issue of whether the life expectancy of Mrs. Probst was 70 years or 64.4 years). However, because of the problem involving policy limits, we assess damages separately for each accident.
We set general damages for the injuries sustained by Mrs. Probst in the first accident at $50,000. Insofar as general damages and past and future lost wages sustained as a result of the second accident are concerned, we keep in mind that the only defendant before us in this appeal is State Farm and its liability resulting from the second accident is limited to $100,000, the uninsured motorist limit of the single policy affording Mrs. Probst coverage in that accident. As the total of general damages and past and future lost wages clearly exceed this limit of State Farm's coverage, we find it unnecessary to discuss the amount of each item in detail and we award $100,000, the policy limit, for the second accident.
For the reasons assigned, the award in favor of plaintiff, Frances Dargis Probst, and against appellant, State Farm Mutual Automobile Insurance Company, is decreased from the sum of $330,899.32 to the sum of $150,000. As thus amended, the judgment appealed from is affirmed. Costs of this appeal are to be paid by the appellant, State Farm Mutual Automobile Insurance Company.
AMENDED AND AFFIRMED.

ON REHEARING
CURRAULT, Judge.
In our original opinion, we affirmed the trial court judgment in favor of plaintiff who sustained permanent injuries as a result of two automobile accidents. However, we also found that the injuries were susceptible of being apportioned between the two separate occurrences and reduced the judgment in accordance with the respective policies in effect. At the time of the first accident, plaintiff was covered by three uninsured motorist policies issued by defendant, State Farm, with total policy limits of Three Hundred Thousand Dollars ($300,000). When the second accident occurred, one uninsured motorist policy of One Hundred Thousand Dollars ($100,000) was in effect. Because the first collision happened prior to enactment of amended LSA-R.S. 22:1406(D)(1), we concluded plaintiff was entitled to stack the first three policies totaling *742 $300,000. We also held that the trial court did not abuse its discretion in awarding plaintiff damages in the amount of Three Hundred Thirty Thousand Eight Hundred Ninety-nine and 32/100 Dollars ($330,899.32).[1] However, we also found that the major damages resulted from the second accident. Consequently we reduced the judgment to One Hundred Fifty Thousand Dollars ($150,000), apportioning $50,000 of damages to the first accident and $100,000 to the second accident, which amount equaled the policy limits in effect at that time.
After rehearing, we re-analyzed the evidence in the record resulting in our decision to vacate our prior judgment in light of that re-evaluation, but only insofar as our decision found the damages susceptible of apportionment and insofar as the amounts of recovery we awarded because of that apportionment. As a result, two new issues are before the court. The first, undisposed of previously in light of that opinion, involves the amount of future damages awarded. The other, raised in argument on hearing concerns the date from which legal interest accrues in an action between an insured and his uninsured motorist carrier.
Our re-evaluation of this case shows that the facts found in our original opinion are correct. In summary, plaintiff-appellee, Mrs. Probst, a school teacher, was involved in an accident on October 31, 1976, wherein she sustained injury to her neck and back for which she immediately sought treatment at East Jefferson General Hospital and, on the following day, came under the care of orthopedic surgeon, Dr. Russell Levy. The testimony of Mrs. Probst and the perpetuated deposition testimony of Dr. Russell Levy, as well as medical invoices, indicate that over the next year plaintiff remained under the care of Dr. Levy for persistent pain complaints associated with spasm of the cervical area. Treatment included the prescription of muscle relaxants, pain medication and a cervical collar. Further, Mrs. Probst was required to undergo physical therapy for a period of approximately six months and, during the first three months, was actually required to undergo physical therapy on a daily basis.
Approximately one year subsequent to the date of the first accident on October 28, 1977, and while still under the care of Dr. Levy for persistent neck pain, she was involved in her second accident. Subsequent to this accident, she remained under the care of Dr. Russell Levy, again for persistent neck pain. She was eventually hospitalized for the first of three separate hospitalizations on January 6, 1978 at Lakeside Hospital where myelographic studies were performed indicating disc disease with nerve root impingement at Level C-4, C-5 and C-6. After a sixteen-day hospital confinement, plaintiff was discharged on January 21, 1978. The evidence indicates that even though plaintiff was offered cervical intervention at this time, it was refused for the combined reasons of extreme fear of spinal surgery and the hope that her condition would improve, or at least allow petitioner to conclude the school year.
Eventually, in May of 1978, the evidence indicates that Mrs. Probst sought the opinion and treatment of orthopedic surgeon, Dr. Rudolph Hamsa, under whose care petitioner remains to the present date. During the approximate first year and a half under Dr. Hamsa's care, she continued to suffer severe pain and spasm in the cervical area requiring the use of traction, pain medication and muscle relaxants. Finally, and as a result of the continued medical problems, she retired from her lifelong profession in the educational system on Dr. Hamsa's advice on January 1, 1979. Both Dr. Hamsa and Susan Smith, occupational therapist who treated Mrs. Probst after her retirement, felt that the requirements of Mrs. Probst's employment as a school principal, as well as a psychological stress factor aggravated her persistent problems. Because of the above, the trial court found, and we reiterate our original finding of no manifest error, that the amount of plaintiff-appellee's damages totaled Three Hundred *743 Thirty Thousand Eight Hundred Ninety-nine and 32/100 Dollars ($330,899.32).
Based on testimony and evidence adduced at trial, the trial court also found that plaintiff established that the independent acts of the defendants Ronald J. Wroten and Ralph Hales concurred in producing her injuries and damages. The law, therefore, imposes on each of the defendants the burden of proving his own innocence or his own limited liability. Bergeron v. Thomas, 314 So.2d 418 (La.App. 1st Cir.1975). The court found defendants failed to meet this burden and quoted Dr. Russell Levy, Mrs. Probst's first treating orthopedic physician, who stated in deposition the following:
... so I don't think you can really separate the second accident totally, I think, from the first accident.... I think she has a combined problem with two accidents and probably not being in the best physical condition. So the combination of those things did it.
The trial court continued by stating:
"Citing Prosser on Torts, p. 266 (2d Ed.), William L. Prosser, plaintiff's post-trial memorandum noted the following:
Once it is determined that the defendant's conduct has been a cause of some damage suffered by the plaintiff, a further question may arise as to the portion of the total damage sustained which may properly be assigned to the defendant, as distinguished from other causes. The question is primarily not one of the fact of causation, but of the feasibility and practical convenience of splitting up the total harm into separate parts which may be attributed to each of two or more causes. Where a logical basis can be found for some rough practical apportionment, which limits a defendant's liability to that part of the harm which he has in fact caused, it may be expected that the division will be made. Where no such basis can be found and any division must be purely arbitrary, there is no practical course except to hold the defendant for the entire loss, notwithstanding the fact that other causes have contributed to it. The distinction is one between injuries which are reasonably capable of being divided, and injuries which are not."
It is further stated at page 250 that "where two or more causes combine to produce a single result, incapable of any logical distinction, each may be a substantial factor in bringing about the loss, and if so, each must be charged with all of it."
Relying on the testimony of Dr. Levy, and in the absence of any evidence presented by defendants to the contrary, the court is convinced it is unable to attribute with any degree of certainty the various injuries suffered by plaintiff on a proportionate basis to each of the respective accidents. Since the uninsured motorist carrier stands in the shoes of the tortfeasor,[2] defendant State Farm is therefore liable for the full amount of plaintiff's injuries totaling Three Hundred Thirty Thousand Eight Hundred Ninety-nine and 32/100 Dollars ($330,899.32), payable up to the combined policy limits of Four Hundred Thousand Dollars ($400,000), since we also reaffirm the ability of plaintiff to stack all of the policies in effect at the time of both accidents.
In regards to the issue of future earnings which we did not address in our original opinion, our review of the record indicates that the trial court did not commit manifest error.
The trial court awarded the plaintiff One Hundred Ninety-six Thousand Five Hundred Twenty-three Dollars ($196,523) for future loss of earnings, and appellant claims plaintiff has failed to carry her burden of proving by a preponderance of the evidence any loss or diminution of earning capacity. Appellant further asserts that it is simply not enough to show that the plaintiff might not be able to return to her former occupation, but that plaintiff must also prove that she will be able to return to no other form of work, or, if she can return to work, that she will sustain some loss. *744 See: Profit v. Linn, 346 So.2d 253 (La.App. 1st Cir.1977); and Parfait v. State of Louisiana, Through the Department of Highways, 334 So.2d 549 (La.App. 1st Cir.1976). Appellant is correct; however, the testimony of Dr. Hamsa, the treating physician and Ms. Susan Smith, the occupational therapist, concurred that Mrs. Probst is unable to return to her prior occupation. The contrary testimony did not convincingly dispute this conclusion. After reviewing all the testimony in this regard, as well as the testimony as to other types of work she could perform, it is apparent that Mrs. Probst will have difficulty in any job involving long periods of sitting or walking.
Defendant also argues that the court should reject the seventy year work-life expectancy used by Mr. Clesi, an actuarial expert, and as a legal matter utilize the work-life expectancy projected by the Department of Labor statistics, i.e., 64.4 years. However, the evidence in this case justifies an acceptance of Mr. Clesi's projected figures as reasonable. Testimony indicated appellee has been an employee of the Jefferson Parish School System for 32 years, and that for the past 18 years, she has been a principal in the system. Appellee testified that she intended to work until the mandatory retirement age of 70 years, and had in fact attempted to return to work several times following the accidents. Based on Mrs. Probst's past work history, and her own testimony of her future intentions, the court felt it proper to accept the work-life expectancy suggested by Mr. Clesi of 70 years. Appellee aptly noted that the government tables include all 58 year old women and does not take into account occupation, education or work experience and, at most, is only an average and relevant only to that extent. The table, by its nature, does not and cannot take into consideration the goals, aspirations, hopes and dreams of a particular individual. Obviously, if a 58 year old woman would be killed, and a wrongful death action brought, and no testimony introduced concerning that person's work goals, then certainly the table would be a relevant factor in estimating work expectancy. The trial court noted that a similar result was reached by the court of appeal in addressing an almost identical issue in Lalonde v. Weaver, 360 So.2d 542 (La.App. 4th Cir.1978).
Based on the foregoing, we hold that the trial court was correct in using the 70 year work-life expectancy under its discretionary powers.
The final question requiring our attention involves that portion of the judgment awarding interest from date of judicial demand. Appellant asserts that interest should accrue from date of judgment in that the obligation to the insured is conventional. On this issue, appellant relies on Guidroz v. Tauzin, 413 So.2d 682 (La.App. 3d Cir.1982); Horstmann v. Drake, 420 So.2d 473 (La.App. 4th Cir.1982). We disagree.
In an action ex delicto, legal interest attaches from date of judicial demand. LSA-R.S. 13:4203. The obligation of an uninsured motorist carrier by law and the terms of the policy is in solido with the tortfeasor. Hoefly v. Government Employees Insurance Company, 418 So.2d 575 (La. 1982). Both the tortfeasor and the uninsured motorist carrier are obliged thus to the same thing, that is to repair the damage. Chiasson v. Whitney, 427 So.2d 470 (La.App. 5th Cir.1983); Hoefly, supra. Consequently, in an action between the uninsured motorist carrier and the insured, it is our opinion that legal interest accrues from date of judicial demand. Chiasson v. Whitney, supra.
In conclusion, the judgment of the trial court is hereby affirmed and reinstated in all respects. Appellant is to pay all costs of this appeal.
AFFIRMED.
SAMUEL, J., concurs with reasons.
SAMUEL, Judge, concurring.
For the reasons expressed in our original opinion, I am convinced our original decree is correct and should be reinstated on this rehearing.
*745 Nevertheless, on more mature consideration, I now find I cannot disagree with the majority's rehearing decree. The reason for this finding is the recent line of Louisiana Supreme Court cases holding extremely strict compliance must be accorded to the second paragraph of Sub-part 3 of Civil Code Article 1934.[1] It appears to me that such strict compliance, certainly to the extent espoused by the Supreme Court, effectively lessens, and in many instances actually removes, the constitutional jurisdiction and duty of Louisiana Appellate Courts to review questions of fact in all civil cases (La. Const.1974, Art. 5, Secs. 5(C) and 15(B).
Under the line of cases referred to, I see no material difference between Louisiana, which historically and presently allows and requires appellate review of facts in civil cases, and all the other states which prohibit such review. In my view, we are giving more weight and higher authority to one of our statutes than to the Constitution itself.
Accordingly, as I am required to follow the mandates of the higher court, I respectfully concur.
NOTES
[1] It should be noted that Mr. Probst recovered medical expenses under the medical payment provisions of the policies, which are separate from the uninsured motorist provisions.
[2] Courville v. State Farm Mut. Auto. Ins. Co., La.App., 386 So.2d 176; Cutrer v. Brumfield, La.App., 372 So.2d 648; Manuel v. American Indem. Co., La.App., 368 So.2d 1200; Ryder v. Trisler, La.App., 367 So.2d 1257; O'Banion v. Allstate Ins. Co., La.App., 347 So.2d 878.
[3] See Williams v. Winn Dixie, Louisiana, Inc., La.App., 418 So.2d 13.
[4] La.App., 342 So.2d 1181.
[5] La.App., 293 So.2d 671.
[6] La.App., 240 So.2d 767.
[1] Canter v. Koehring Company, 283 So.2d 716 (La.1973).
[2] Hoefly v. Government Employees Insurance Co., 418 So.2d 575 (La.1982).
[1] In pertinent part providing: "In the assessment of damages under this rule, as well as in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury...."