556 So.2d 1307 (1990)
Jon NASTASI
v.
Dean FEJKA, et al.
No. 89-CA-449.
Court of Appeal of Louisiana, Fifth Circuit.
February 2, 1990.
Emery Voorhies, Anthony J. Clesi, Jr., Ward & Clesi, New Orleans, for Dean Fejka, defendant-appellee-appellant.
*1308 C. Gordon Johnson, Jr., Porteous, Hainkel, Johnson & Sarpy, John A. Kopfinger, Jr., New Orleans, for State Farm Mut. Auto. Ins. Co., defendant-appellant.
B.R. "Bobby" Malbrough, Metairie, for plaintiff-appellee, Jon Nastasi.
Before BOWES, GRISBAUM and WICKER, JJ.
BOWES, Judge.
Defendants Dean Fejka (hereinafter Fejka) and State Farm Mutual Automobile Insurance Company (hereinafter State Farm) appeal a jury verdict and subsequent judgment finding them liable in damages to the plaintiff, Jon Nastasi (hereinafter Nastasi), in the total amount of $600,000.00, plus legal interest. We revise, and, as revised, affirm.

FACTS
In 1980, repair work was needed on a section of a sewer mainline, which runs parallel to Transcontinental Boulevard in Metairie, in Jefferson Parish. Jefferson Parish (hereinafter the Parish) entered into an agreement with a consulting engineering firm, N-Y Associates, Inc. (hereinafter N-Y) to design construction plans and specifications for construction of the sewer main force project. Under this agreement, N-Y was to provide all phases of design work necessary to complete the project and, in fact, prepared comprehensive specifications. At the request of the Parish, N-Y drew up a traffic maintenance plan in accordance with restrictions and "input" from the Parish, titled "Transcontinental Drive Detour Plan." After review of the design, Combustion Engineering, Inc. (hereinafter Combustion) was awarded the construction contract via the requisite bidding process. Phil Nelson. Project Engineer for N-Y, monitored Combustion's work to ensure that the plans were followed according to the design of N-Y. Part of this supervision included observation of the placement of traffic devices and signs. As per the plans, the two southbound lanes of Transcontinental were closed and the two northbound lanes converted to two-way traffic on September 17, 1984. Various barricades and signs were posted along the route to warn motorists of the traffic change. The plan designated that a sign be placed on Harvard (and on other intersecting streets) at a distance preceding the intersection at Transcontinental, which read "Road Construction Ahead." The plan also called for signs designating "Two-Way Traffic" with opposing directional arrows at regular intervals on Transcontinental, although these latter signs were not designed to be placed at the intersection, but, rather, between intersections.
On September 20, 1984, defendant Fejka, a resident of Lacombe, Louisiana, travelled to Metairie to visit relatives. Between the home of his brother, on Butternut Street, east of Transcontinental, and his parents' home on Princeton, west of Transcontinental, Fejka drove down Harvard, planning to turn right at Harvard and Transcontinental, then left at Transcontinental and Camphor. At the Harvard/Transcontinental intersection, Fejka stopped at the stop sign and looked to his left, in the direction from which traffic would ordinarily proceed. He then made a right turn into the left lane of Transcontinental, colliding head-on with the vehicle driven by Nastasi. Nastasi was driving south in the left lane, as necessitated by the construction program.
Nastasi received injuries which resulted in orthopedic surgery, and eventually received a percentage disability rating, all of which will be discussed hereinafter.

PROCEDURAL HISTORY
Nastasi filed suit originally against Fejka, State Farm as the insurer of Fejka, T.L. James and Company, Louisiana Paving Company, Inc., and Switzer Mechanical Contractors (these latter three defendants were alleged to have performed the construction work on Transcontinental). In the course of several amending petitions, Combustion Engineering, N-Y, and the Parish of Jefferson were added as defendants. T.L. James and Louisiana Paving settled with Nastasi and were dismissed from the suit, while Switzer was voluntarily dismissed.
*1309 Numerous cross claims and third party demands were filed. State Farm answered the suit on its own behalf, denying coverage to Fejka. Fejka retained his own attorney and filed an answer, a third party demand against State Farm, and cross claims against the remaining defendants. By the time of trial, the parties who remained in the suit were Nastasi, Fejka, State Farm and N-Y.
The Parish settled with Nastasi shortly before trial, although the question of its comparative negligence remained an issue at the trial, along with the question of the comparative negligence of two other parties.[1]
Trial on the merits was held before a jury over a four-day period. At the conclusion of the trial, the jury found that Fejka, the Parish and N-Y were at fault in the degrees of 80%, 10% and 10%, respectively, and that Nastasi was not at fault. The jury further found that State Farm was the insurer of Fejka at the time of the accident, and awarded Nastasi $50,000 in special damages and $550,000 in general damages. In making the verdict a judgment of the Court, the judge awarded the damages as granted by the jury against Fejka, State Farm and N-Y, plus interest and costs; fixed expert fees; granted judgment in favor of N-Y on its cross claim against Fejka and State Farm for contribution "to be offset by one-half of any amounts paid by them to plaintiff."
State Farm filed a motion for a judgment notwithstanding the verdict or alternatively for a new trial or, further, to amend the judgment to reflect that State Farm is solidarily liable with Fejka only to the extent of its policy limits. The trial court denied the motion on all counts. Fejka and State Farm have appealed. N-Y has not filed a motion for appeal in the present case.
On appeal, State Farm urges that it is not liable to plaintiff, as it had cancelled Fejka's liability policy prior to the date of the accident, and alternatively argues that it should be liable only up to its policy limits. Fejka appeals the finding of comparative negligence and the quantum awarded to Nastasi, and further responds to State Farm by urging that the trial court correctly determined coverage.

COMPARATIVE NEGLIGENCE
At trial, Fejka testified that as he is a resident of Lacombe, he had not been in the area in question since construction had begun, some three days earlier. He further stated that he saw no warning signs of any kind on either Harvard or Transcontinental (at the intersection), either before or after the accident. He stated that he stopped at the stop sign on Transcontinental, checked traffic to his left, and proceeded to execute a right turn from Harvard into the left lane on Transcontinental. He saw a police car on the other side of the intersection, but no barricade or signs. Then: "I started to make my turn and to my surprise there was another car there. That is my first recollection of Mr. Nastasi. It happened in a second."
Apparently due to the angle at which Harvard intersects Transcontinental, which is less than 90 degrees, a "normal" right hand turn is somewhat difficult to execute. Fejka stated that rather than turning into a rut created on the grass by vehicles making a sharp turn, he regularly chose to swing out wide, causing his car to initially move somewhat into the left lane because "Tires aren't cheap." Further, he moved toward the left lane to facilitate the left turn, which he expected to make on the other side of Transcontinental at Camphor.
Nastasi testified that following the accident, he too looked around and saw no signs relative to a directional change in traffic. As previously noted, the original design did not provide for a two-way warning sign at the intersections, but, rather, at *1310 intervals along Transcontinental. Phil Nelson, who worked in the field for N-Y, was responsible for ensuring that the construction proceeded in accordance with the specifications. Information was submitted by N-Y to the Parish for review by the Parish, and for approval, modification, or revision. Nelson was not certain of the actual placement of signs on the date of the accident.
The Parish, through its office of traffic engineering, suggested certain modifications and ultimately approved the revised plans. As of the date of the accident, changes for traffic control were still being implemented, according to Nelson, because of more suggestions by the Parish for further changes.
The testimony indicates that there was a barricade at Harvard and Transcontinental, at the median, although it is not clear whether the police vehicle was in front of, or in back of, the barricade. Officer Michael Cain, a reserve deputy with the Jefferson Parish Sheriff's office employed by Combustion at the time of the accident, and who went to the scene of the accident within minutes (although he was not the investigating officer), testified that the barricade at Harvard and Transcontinental did have a two-way warning sign.
Considering all the evidence and testimony at trial, we conclude that the jury resolved the conflicts in certain testimony to determine: 1) that there were inadequate provisions for, and inadequate implementation of, warning signs alerting traffic to the directional changes; (2) nevertheless, they apparently did believe Officer Cain's testimony that there was a two-way warning sign at Harvard and Transcontinental and rejected the testimony of Fejka and Nastasi that there were none (at least, each did not see one). Evaluation of the credibility of witnesses is, without doubt, the province and function of the jury; and we cannot say that this conclusion was clearly wrong.
However, in addition to that, it is also clear that Fejka had a duty to see what he should have seen, namely the Nastasi vehicle, already approaching in the left lane of traffic, before turning into that lane. Further, while the angle of the Harvard and Transcontinental intersection was less than ideal, it was not so slanted as to prevent a proper right turn into the right lane, even if (in some cases) it was necessary to turn somewhat onto the grassy corner. Testimony by a defense witness, Dr. Olin Dart, and plaintiff's expert, Dwaine Evans, indicated that while the angle would make it necessary for a turning driver to take more space for a wider turn, such did not necessarily result in an encroachment onto the left lane. Accordingly, we conclude that Fejka's execution of the turn was a proximate cause of the accident and violated LSA-R.S. 32:101, which states in pertinent part:
A. The driver of a vehicle intending to turn at an intersection shall proceed as follows:
(1) Right turns. Both the approach for a right turn and a right turn shall be made as close as practicable to the right-hand curb or edge of the roadway.
Reinforcing our conclusion is the Court's observation in Davis v. Bowman, 346 So.2d 225 (La.App. 4 Cir.1977) as follows:
A motorist in making a right turn has a statutory duty to ascertain that both the approach for the turn and the turn itself shall be made as close as practicable to the right hand curb or edge of the roadway. See LSA-R.S. 32:101. Moreover, a motorist shall not turn a vehicle at an intersection unless the vehicle is in the position above described or otherwise turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety. See LSA-R.S. 32:104.
* * * * * *
Defendant testified that he surveyed the area before making the turn. However, this did not free him of negligence. In Jones v. Armstead, 169 So.2d 268 (La.App. 1 Cir. 1964) the court found a driver making a right turn negligent for looking in his mirror and not seeing the following car, stating: "To look and not [to] see [a] vehicle is equivalent of not looking at all and is negligence." *1311 Davis v. Bowman, 346 So.2d 225 (La. App. 4 Cir.1977)
In Sullivan v. Zetz 7-Up Bottling Co., 376 So.2d 614 (La.App. 4 Cir.1979), defendant contended that the length of his truck necessitated that he execute a wide right turn. In finding defendant negligent, the Court stated:
Ventura cannot rely on this law as an absolute defense because he had the duty to ascertain his turning maneuver would not interfere with the progress of another motorist for whom the left lane was designated. Stated another way, if he had to turn wide he was first obliged to ascertain it was safe to do so. In Taylor v. Allstate Insurance Company, 205 So.2d 807 (La.App. 1st Cir.1967), the court stated that one making a right turn who allows his vehicle to protrude over into a lane adjacent to the right lane is negligent. A turning motorist must make sure his maneuver can be safely executed before attempting it. See Nesbit v. Travelers Insurance Company, 218 So.2d 396 (La.App. 2d Cir.1969), and Scott v. Travelers Insurance Company, 194 So.2d 154 (La.App. 1st Cir.1966).
Considering the above facts, statutory law and jurisprudence, we find no manifest error in the determination by the jury that Fejka was 80% at fault in the accident.

DAMAGES
At the time of the trial, Nastasi was 34 years old; on the date of the accident, he was 31. He was unmarried both at the time of trial and of the accident. Nastasi dropped out of high school in ninth grade, and began working in the construction business. After several years, he learned installation and servicing of air conditioners, and worked, off and on, in that trade for a number of years as an employee of Fred Marks. He was later a construction foreman for Cabildo Construction Company. Following this employment, he, his brother and father, operated a business called "Southern Comfort Heating and Air Conditioning", in which air conditioners were sold, installed and serviced. After leaving that enterprise, Nastasi was again a foreman at a construction company; he and his brother later formed "Southern Comfort Services" (another air conditioning business) and Nastasi also worked in that business part-time, until the construction company closed. On the morning of the accident, he was working both for the first "Southern Comfort Heating and Air Conditioning" business and also "Southern Comfort Services."
Following the impact, Nastasi was able to drive home, but increasing pain in his neck and shoulders, and numbness on the left side of his face, caused him to consult Dr. Rudolph Hamsa, an orthopedic surgeon. X-rays revealed an acute cervical disc syndrome. Dr. Hamsa at first prescribed medication and physical therapy for plaintiff. Nastasi attended physical therapy twice a week for several months, and continued treatment with Dr. Hamsa by medication until March of 1986. At that time, Nastasi was hospitalized for further diagnostic studies. A cervical myelogram was performed, which revealed abnormalities at C-5,6 and C-6,7. A discograph was performed at one level, which proved so painful that Nastasi pleaded with the physicians not to do the other two levels. The exams revealed a ruptured cervical disc at C-5,6 with degenerative changes at C-4,5 and C-6,7. A cervical fusion was performed at the three levels by Dr. David Akin. Including the time spent in the hospital prior to surgery, plaintiff was hospitalized for 13 days. Mr. Nastasi had to wear a neck brace for three months; he was restricted to his home completely for three weeks, and could not drive, bend, stoop, lift, or even shave. After three months, he graduated to a soft cervical collar, which he was obliged to wear for three more months. He continued to suffer pain and headaches, necessitating continued medications for several more months.
As of the time of trial, he suffered some residual pain and usually wears the collars when he drives. He is unable to lift heavy weights, his physician having prohibited him from prolonged stooping, bending and lifting in excess of fifty pounds. In attempting to return to his business, he is unable to work more than two hours without excessive pain and stiffness. He has *1312 been assigned a whole body disability rating of 18%, and his physician has restricted him from doing the heavy physical labor required in his former occupation.
Dr. Cornelius Gorman, an expert in Vocational Rehabilitation, evaluated Nastasi and, given his educational background, physical problems, and work experience, concluded that plaintiff could only perform jobs such as customer service clerk in the air conditioning or mechanical industries, order writing, or some occupation which limits indoor work. Dr. Gorman felt that Nastasi would be uncomfortable doing strictly "office work"; Nastasi would also require some vocational counseling and training. Dr. Gorman felt that, although plaintiff had an eagerness to work, stating that "He is going to make it one way or another", his wage profile is $5.00 an hour.
On cross-examination, Dr. Gorman stated that he felt Nastasi could do work which would require him to read and figure, as in the hotel/motel industry, but that he would be (emotionally) uncomfortable; and that Nastasi was also capable of doing estimates for construction companies and for air conditioning business; and could perform as a construction foreman or in some kinds of bench work repair.
Ms. Jennifer Palmer, a vocational specialist called by N-Y, evaluated plaintiff through documents and written material, having never examined him. She also found that Nastasi could perform bench repair work, warehouse supervision, production scheduling and stock clerking, although she opined that bench repair would be his best choice. Ms. Palmer stated that there was, at the date of trial, a particular opening with a particular company for which Nastasi is qualified, and which paid up to $700.00 per week. Several other jobs were discussed which Ms. Palmer felt were available to plaintiff and which had varying salary levels, all well above $5.00 per hour.
Richard Kelly, a certified public accountant, testified as to the value of plaintiff's lost wages. He determined that past lost wages equalled $35,958.00, with future losses ranging from $557,882, if Nastasi were totally unemployable, to $418,111 (employment at present minimum range) to $349,268 (employment at $5.00 per hour). To arrive at this figure, Mr. Kelly annualized Nastasi's income for 1986 (a year during which Mr. Nastasi had surgery and was still recovering for several months) since he initially stated that he had no wage information prior to 1986. He further utilized an inflation rate of 5.81%, plus a "real compensation index for a combined increase factor of 6.97%, and a discount rate of 8.5%" to arrive at his figures. However, on cross-examination, Kelly stated that the inflation rate had been 3.5% in 1987 and that he could not recall when it had ever been 5.81%. He then stated that some economists, "not C.P.A.'s", believed a rate of 4.25% was more appropriate.
Dr. Kenneth Boudreaux, an economist called by N-Y, opined that the base used by Mr. Kelly of 1986 wages was not sufficiently broad enough, in the case of Mr. Nastasi, from which to derive calculations. Having examined plaintiff's wage records from 1981 through 1984, the year after the accident, Dr. Boudreaux averaged Nastasi's earnings at $13,576.86 per year. Given the testimony of Ms. Palmer, Dr. Boudreaux felt that Nastasi would suffer no future loss of income. Dr. Boudreaux testified that economists in the country projected future inflation between three and five per cent and that the figures used by Kelly were not reasonable.
We are unable to determine from the record whether or how the jury divided the award into losses for pain and suffering, past lost wages, and future lost wages. Therefore, we must examine the award as a whole, and determine whether, as a whole, the jury abused its discretion in awarding plaintiff $550,000.
We find that the figures presented by Mr. Kelly, which represent loss of income, are problematic and inaccurate in several respects. To begin with, the base figure used by Mr. Kelly to annualize lost earnings was for one year, 1986, which was two years post-accident, even though it was elicited from Kelly, on cross-examination, that he did have figures on plaintiff's earnings for 1983, 1984 and 1985. Additionally, we find that the 5.81% rate of inflation, *1313 coupled with the real compensation index factor for an increase factor of 6.97%, appears to be unreasonably high based both on his own testimony and that of Dr. Boudreaux. Finally, and most importantly, even accepting Mr. Kelly's computations, we find that the record does not support a conclusion that Nastasi is either unemployable, or is capable of earning only $5.00 per hour as a clerk in some "customer service" job. Dr. Gorman's evaluation to that effect was tempered by his later finding that plaintiff is capable of being a construction supervisor or foreman, doing clerical hotel/motel work, or bench repair, and by the testimony of Ms. Palmer relative to the salary ranges in the repair occupations.
Additionally, we find that while plaintiff may find more emotional satisfaction, according to Dr. Gorman, in an outdoor job, that he is capable of earning a (more) reasonable living in an indoor occupation as well. Further, his experience as a construction foreman adds to the likelihood of his obtaining employment in that field, and his medical problems do not, according to Dr. Gorman, preclude such employment.
Accordingly, we find that the testimony and evidence as a whole preponderate toward the conclusion that Mr. Nastasi's commendable determination to succeed, combined with his capabilities and experience, place him above the level of a person capable of earning minimum wage or $5.00 per hour. Therefore, the range of lost wages given by Mr. Kelly on the basis of information which was less than accurate, must be discounted to some extent.
Mathematical projections of future earnings may be used as one of the guides employed by the courts in computing an award for loss of future income.

Brown v. Southern Farm Bureau Ins. Co., 426 So.2d 684 (La.App. 1 Cir. 1982) [emphasis supplied]
... the testimony of an economist is entitled to weight, but since it is necessarily based on uncertain future events, it is not conclusive.... The amount of damages awarded should, however, compensate plaintiff for the difference between his ability to earn immediately prior to the injury and his ability to earn after the injury. [cites omitted]

Cutchall v. Great American Pump Co., 460 So.2d 1106 (La.App. 2 Cir. 1984)
Also Bernard v. Casualty Reciprocal Exchange, 534 So.2d 1348 (La.App. 5 Cir. 1988).
However, we are of the opinion that the record supports the conclusion that Mr. Nastasi suffered serious injuries and continues with some permanent problems. He has been given an 18% disability of the body as a whole. He was obliged to undergo painful preoperative procedures and serious surgery; his postoperative life was severely curtailed for some months and he is unable to engage in the long term strenuous physical labor which formerly occupied him. We note, though, that while it appears that the quality of his life has been diminished somewhat from his former style, it is not clear from the record how the injury will permanently affect areas outside Nastasi's work field. Other than his (probable) change of occupation, there is little evidence of any significant permanent loss in the private and recreational portions of his life.
The above articulated analysis of the facts of the particular case before us are made in keeping with the directions of our Supreme Court in Reck v. Stevens, 373 So.2d 498 (La. 1979), which we quote at length:
Before a trial court award may be questioned as inadequate or excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the present case. Only after analysis of the facts and circumstances peculiar to this case and this individual may a reviewing court determine that the award is excessive.
With regard to appellate review of the much discretion of the trier of fact in the award of general damages, La.C.Civ.P. art. 1934(3), we stated (after exhaustive review of the facts, and reversing the appellate court for disturbing (on the basis of prior awards) the trier of fact's award) in Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127, 132 (1967) (Italics ours):

*1314 "The law is plain and means what it says, and it is the duty of all appellate courts to follow it. Under this rule the amount of damages assessed by the judge or jury should not be disturbed unless the appellate court's examination of the facts reveals a clear abuse of the discretion vested in the trial court.... The facts and circumstances in the other neck injury awards, relied upon by respondent as showing that this award was all out of proportion with the previous awards for similar injuries, causes them to have little or no relevancy for purposes of demonstrating the excessiveness of this award."
Thus, the initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is, a clear abuse of the trier of fact's "much 3 discretion," La.Civ.C. art. 1934(3) in the award of damages. It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered either excessive, Carollo v. Wilson, 353 So.2d 249 (La. 1977); Schexnayder v. Carpenter, 346 So.2d 196 (La.1977), or insufficient, Olds v. Ashley, 250 La. 935, 200 So.2d 1 (1967). Only after such determination of abuse has been reached, is a resort to prior awards appropriate under Coco for purposes of then determining what would be an appropriate award for the present case.
* * * * * *
However, absent an initial determination that the trial court's very great discretion in the award of general damages has been abused under the facts of this case, the reviewing court should not disturb the trier's award. Wilson v. Magee, 367 So.2d 314 (La.1979).
Under the particular facts of this case, we find that an award of general damages in the amount of $550,000 was a clear abuse of discretion vested in the trier of fact.
We have reviewed several similar cases and note the following range of awards for cervical disc injuries requiring surgery: Williams v. City of New Orleans, 433 So.2d 1129 (La.App. 4 Cir. 1983) granted $125,000; Boudreaux v. Murray, 489 So.2d 948 (La.App. 5 Cir.1986), included a disability rating of the plaintiff of 20%, and granted $100,000; Probst v. Wroten, 433 So.2d 734 (La.App. 5 Cir.1982), affirmed an award of $100,000; Williams v. City of New Orleans, 433 So.2d 1129 (La.App. 4 Cir.1983), affirmed an award of $100,000; and Wolfshohl v. Boudreaux, 482 So.2d 954 (La.App. 3 Cir.1986), in which the court awarded $40,000.
Noting the above awards, and considering them in conjunction with our examination of the possible wage losses experienced by Mr. Nastasi as enumerated above, we find that an award of $425,000 is the highest amount that the jury or the trial court could have reasonably awarded. Reck, supra; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). Such award will fairly compensate Mr. Nastasi for the losses sustained by him as a result of the accident. This reduction affects only the general damage award, inasmuch as the award of $50,000 in special damages has not been appealed and is therefore not before us. Accordingly, we revise this portion of the judgment to reflect an award in general damages in favor of Nastasi in the amount of $425,000.

LIABILITY OF STATE FARM
State Farm has urged that the verdict of the jury that State Farm was the insurer of Fejka on the date of the accident is erroneous because State Farm proved at trial that it had effectively cancelled Fejka's policy due to failure to pay the applicable premium. Alternatively, State Farm avers that it should be found liable only up to its policy limits.
At trial, it was established that Fejka had had insurance on his automobiles with State Farm for several years prior to 1984. The 1983 Toyota in which Fejka had the accident had been insured with State Farm since the vehicle was purchased in 1983. In past dealings with State Farm, Fejka had often made partial payments on his premiums which the insurance company accepted, billing him for the remainder of the *1315 premium due. As Fejka explained, his business often took him out of town, and he and the insurance agent, Hilton Pettit, arranged together to permit partial premium payments. On prior occasions, when the premiums were past due, and the insurance was about to lapse, Fejka would pay the premium late and it was always accepted.
On June 3, 1984, Fejka visited the State Farm office of Hilton Pettit and paid $200.00, filling out two applications for his vehiclesthe Toyota, on which he desired to continue coverage, and an International Scout, which Fejka had recently purchased as a secondary recreational vehicle. At the office, for reasons unclear in the record, the entire $200.00 was allocated toward the Scout, and thus forwarded to the main office in Louisiana. Because $200.00 was in excess of the necessary premium on the Scout, a refund check of $93.26 was sent to Fejka, via Pettit, along with a balance due statement of $282.19 for the premium assertedly due on the Toyota. Fejka emphatically denied having received written or verbal notice that the Toyota had not been covered, although Mr. Pettit stated that the premium notice would have been forwarded. Also, Fejka did receive and endorse the refund check. On July 10, 1984, State Farm mailed to Fejka a notice of cancellation stating that coverage would be terminated as of July 23, 1984, because of nonpayment of the policy premium. This notice was sent by certified mail, and it is this notice upon which State Farm relies in its denial of coverage to Fejka for the accident of September 20, 1984.
State Farm claims the notice of cancellation sufficiently complied with LSA-R.S. 22:636.1[2] so as to effectively cancel the policy. The jury disagreed with this contention and specifically found that the Fejka vehicle involved in the accident was insured by State Farm on the day of the accident. We cannot say that their finding is manifestly erroneous for the following reasons.
Testimony at trial revealed that the decision to apply the entire $200.00 to the policy on the new Scout vehicle, rather than to divide the money between the premiums due on both the Toyota and the Scout, was a decision made by Pettit's secretary (according to Pettit's own testimony) and, as explained by Maurine Woodal (another secretary in the office), it was "an error on her part." The application as forwarded to State Farm by the agent, Mr. Pettit, indicated that the entire $200.00 was to be applied to the Scout, thus resulting in the issuance of the refund check for the excess premium.
It is clear that the jury, in finding that State Farm did provide coverage to Fejka, believed that Fejka intended to and indeed did pay the $200.00 as a partial premium on both the Toyota and the Scout, and that it was through error on the part of the State Farm agent that the money was not properly applied. In Ford v. Golemi Albrecht Ins., 522 So.2d 1283 (La.App. 5 Cir.1988), we discussed the liability of an insurer for the acts of his agent:
L.S.A.-R.S. 22:1161 defines an insurance agent as "an individual who is [a]uthorized in writing by any insurer lawfully authorized to transact business in this state, to act as its representative[.]" L.S.A.-R.S. 22:1162 defines an insurance broker as who acts "as agent for an insured or prospective insured other *1316 than himself or itself, and not as a licensed agent of an insurer[.]"
In Raymond v. Zeringue, 422 So.2d 534, 536 (La.App. 5th Cir.1982) we considered the distinction between an insurance agent and an insurance broker as follows:
Insurance agents are persons employed by the insurance company to solicit risks and effect insurance. Insurance brokers solicit insurance from the public under no employment from any special company, placing the insurance with any company selected by the insured or, failing such selection, by the broker himself. The general distinction between them is that, in the absence of special circumstances, the broker is the agent of the insured in procuring the policy of insurance and does not represent the insurer. Foster v. Nunmaker Discount Company, 201 So.2d 215 (La.App. 4th Cir.1967). The acts of one procuring insurance as agent of the insurer are imputable to the insurer while those of one acting as agent of the insured, or as a broker, are not. Karam v. St. Paul Fire & Marine Insurance Co., 265 So.2d 821 (La.App. 3d Cir.1972), affirmed on other grounds, 281 So.2d 728 (La. 1973).
Where an insurance agent acting under the scope of his authority fills out an application for insurance, his acts, representations, and mistakes are those of the insurance company so that if the agent by reason of fraud, mistake, negligence, or omission inserts erroneous or untrue answers to questions contained in the application, the representations bind the insurer but not the insured, provided the insured is justifiably ignorant thereof, has been guilty of no bad faith, and has no actual or implied knowledge thereof. Harris v. Guaranty Income Life Insurance Company, [226 La. 152], 75 So.2d [227 (1954) ]
Pettit testified that he is an employee agent of State Farm. Therefore, the failure of his office to correctly apply the premium is imputable to his principal, State Farm.
Mr. Bill Wilson, operations superintendent for State Farm, testified that the minimum amount which an agent is permitted to accept with an application for a policy is one-third of the premium, and agreed that the allocation of the premium appeared to have been a mistake on the part of the secretary accepting the applications. According to calculations made by Mr. Wilson, we find that if the premium had been applied as intended by Fejka, he would have been covered at the time State Farm sent the original cancellation notice on which it relies. Of the $200.00 paid by Fejka, approximately $41.00 (one-third of the premium due) would have been applicable to the Scout; the remaining premium money should have insured the Toyota through September 16, 1984, at which time a cancellation notice or cancellation itself might have been appropriate (assuming no further premium payments would have been made)but no notice of any kind was sent by State Farmor anyone.
It follows that had the premiums been properly allocated, the cancellation notice sent by State Farm for nonpayment of premium on July 10, 1984, notifying Fejka that the policy would be cancelled on July 23rd for nonpayment of premium, was erroneous (through the fault of their own agent, which is imputed to them) and, therefore, invalid since during that period of time no premium was due. In the absence of a second timely notice in September of cancellation for nonpayment (during the period in which the premium should actually have become due), it is clear that State Farm failed to follow the requirements of LSA-R.S. 22:636.1, supra. Under that statute, therefore, cancellation was not effective, and the jury correctly found that there was coverage on the date of the accident.
Because of our holdings above, we find it unnecessary to determine the adequacy of proof offered by State Farm with reference to its cancellation notification in July.

LIABILITY OF STATE FARM FOR ENTIRE JUDGMENT
State Farm urges that if coverage is affirmed that recovery by Nastasi should *1317 be limited to the amount of its policy limits, which is $50,000.00. State Farm urged the same theory to the trial judge by their post trial motion filed May 20, 1988 and set for hearing on June 29th. By his order denying this motion (and other relief) dated January 10, 1989, and by the language of his final judgment dated May 11, 1988 (adopting the jury verdict), we find that the trial judge was of the opinion that State Farm is liable for the entire amount of the general damages fixed by the jury and not just the policy limits of $50,000.
However, we are of the opinion that the trial court erred, under the circumstances of this case, in failing to limit the liability of State Farm to Nastasi to the amount of the policy limits. The policy issued to Nastasi, which the jury found provided coverage (with which finding we agree) had policy limits of $50,000. The policy was introduced into evidence and pleaded by State Farm. In view of the specific policy language limiting the insurer's liability to $50,000 per person, the judgment should be revised to limit the liability of State Farm (to Nastasi) to the amount of $50,000 (plus interest and costs, etc.). See Brannon v. Shelter Mut. Ins. Co., 520 So.2d 984 (La. App. 3 Cir.1987); Indovina v. Jones, 374 So.2d 174 (La.App. 4 Cir. 1979).
We take notice of the fact that, at oral argument, counsel for Nastasi and Fejka advised the court that another suit by Fejka has been filed against State Farm, and is now pending, seeking to hold them liable for the entire amount of the judgment cast against him for arbitrary and capricious refusal to defend and/or settle this case. Arbitrary and capricious refusal to defend and/or settle has not been specified as error by Fejka in the matter presently on appeal and, therefore, is not before us at this time. We find no other basis on which to hold State Farm liable in solido with Fejka for the entire amount of the judgment, although we do not determine today Fejka's possible right to recovery against State Farm in the pending suit.
For the foregoing reasons, the judgment appealed from is revised to reflect that judgment is granted in favor of appellee Jon Nastasi and against defendants Dean Fejka, State Farm Mutual Automobile Insurance Company and N-Y Associates, Inc., jointly and in solido, in the amount of $50,000.00, and in the amount of $425,000.00 damages against Fejka and N.Y. Associates, jointly and in solido, together with legal interest from date of judicial demand and all amounts taxed as costs involved, including experts' fees, to be divided as per the judgment of the trial court.
We further hold specifically that State Farm is liable to Jon Nastasi only up to its policy limits of $50,000, plus interest, and its share of all amounts taxed as costs as per the judgment of the trial court.
All other aspects of the judgment are affirmed, including the findings as to the comparative negligence of the parties, which percentages are to be applied to the judgment herein.
All costs of this appeal are assessed to appellant State Farm and to Dean Fejka, in equal proportions.
REVISED IN PART AND, AS REVISED, AFFIRMED AND RECAST.
NOTES
[1] Combustion Engineering was found not to be at fault, but it settled at some point with plaintiff and was not represented at trial, although it was not dismissed from the suit until after judgment was rendered. Ronald Albert, another defendant who was insured by State Farm Fire and Casualty Insurance Company, was the owner of property at the corner of Harvard and Transcontinental which was alleged to have contained an overgrowth of foliage, which foliage allegedly obscured Fejka's view as he made the turn on the corner. This defendant was also released prior to trial, and was found by the jury not to have been at fault.
[2] LSA-R.S. 22:636.1 deals with the cancellation of automobile liability insurance policies, and states in pertinent part as follows:

. . . . .
D.(1) No notice of cancellation of a policy to which Subsection B or C of this Section applies shall be effective unless mailed or delivered by the insurer to the named insured at least thirty days prior to the effective date of cancellation; provided, however that where cancellation is for nonpayment of premium at least ten days notice of cancellation accompanied by the reason therefor shall be given. Unless the reason accompanies the notice of cancellation, the notice of cancellation shall state or be accompanied by a statement that upon written request of the named insured, mailed or delivered to the insurer within six months after the effective date of cancellation, the insurer will specify the reason for such cancellation. This Subsection shall not apply to nonrenewal.
. . . . .
F. Proof of mailing of notice of cancellation, or of intention not to renew or of reasons for cancellation, to the named insured at the address shown in the policy, shall be sufficient proof of notice.